# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA

## PRISONER COMPLAINT
## [FOR INMATE ACTION] UNDER 42 U.S.C. § 1983

TRACY HOWARD BESSELAAR,
Name under which you were convicted

135043
Your prison number

CIVIL ACTION NO. 21-W-325-TFM-MU
(To be supplied by Clerk of Court)

vs.

BEOSHA BUTLER, Et. AL.,
Name of Defendant(s)

FOUNTAIN CORRECTIONAL CENTER BOX 3800 ATMORE, AL 36503
Place of Confinement and Address

### INSTRUCTIONS - READ CAREFULLY

A. Complaint Form. You must file your original complaint and a copy for each named Defendant. Your complaint must be clearly handwritten or typewritten. Do not use the back of a page. Your complaint must be signed by you; no notary is required. Any false statement of material fact may serve as the basis for prosecution for perjury.

B. Proper Court. Your complaint can only be brought in this Court if a defendant is located in the Southern District of Alabama and the rest of the defendants are located in Alabama or if your claim arose in this district. The Southern District of Alabama is comprised of the following counties: Baldwin, Clarke, Choctaw, Conecuh, Dallas, Escambia, Hale, Marengo, Mobile, Monroe, Perry, Washington, and Wilcox.

C. Separate Case. It is necessary to file a separate complaint form for each claim unless the claims are related to the same incident or issue.

D. Defendants. The persons who are listed as defendants in section III of the complaint are deemed by the Court to be the only defendants to this action. A defendant's present address must be provided. The Court is unable to serve process without the present address being furnished. The first defendant listed in section III should be the defendant that you list in the style of your case on your complaint form and motion to proceed without prepayment of fees and costs, if applicable, and any other pleading filed with the Court.

Rev. 8/1/15

A. Have you filed any other lawsuits in state or federal court dealing with the same or similar facts involved in this action:

Yes ( )    No (✓)

B. Have you filed other lawsuits in state or federal court relating to your imprisonment:

Yes (✓)    No ( )

F.N.1  C. If your answer to questions A or B above is yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using this same outline.)

1. Parties to this previous lawsuit:

Plaintiffs: _Tracy H. Besselaar_

_____

Defendants: _Sadie Stallworth, et AL_

_____

2. Court (if federal court, name the district; if state court, name the county): _____
_U.S. Southern District of Alabama_

3. Docket Number: _1:21-cv-0037-JB-MU_

4. Were you granted the opportunity to proceed without payment of filing fees?
Yes (✓)  No ( )

5. Name of judge to whom the case was assigned: _M.U._

6. If your case is no longer pending and has been dismissed, state the reason given by the Court as to why your case was dismissed, i.e., frivolous, malicious, failed to state a claim, defendants were immune, etc.

_CASE IS CURRENTLY PENDING._

_____

_____

7. Approximate date of filing lawsuit: _JANUARY, 2021_

8. Approximate date of ruling by court: _____

3

FN.1  I HAVE FILED OTHERS but I do NOT REMEMBER THE CASE INFO AND I
CURRENTLY HAVE NO WAY TO ACCESS THAT INFORMATION. Also, I ATTEMPTED
to FILE ONE IN STATE COURT RECENTLY, but ONLY HALF OF THE
COMPLAINT WAS DOCKETED. THE OTHER HALF, WHICH INCLUDED MY
SIGNATURE, WAS NOT. UNSIGNED COMPLAINT - NO JURISDICTION. Void.

## II. **YOUR PRESENT COMPLAINT.**

A. Place or institution where action complained of occurred: FOUNTAIN CORR. CENTER

B. Date it occurred: JUNE 1, 2021 AND CONTINUING

C. Is there a prisoner grievance procedure in this institution? NO

D. Did you present the facts relating to your complaint in the state prisoner grievance procedure?
   Yes ( )    No ( )

E. If your answer is YES:

   1. What steps did you take? _____

   2. What was the result? _____

F. If your answer is NO, explain why not: _____

G. Your claim (briefly explain your claim: what, when, where, who; do not cite cases; you may, without leave of Court, add up to five (5) additional pages if necessary):

PLEASE SEE attached pages —

_____

Also, BECAUSE I AM INDIGENT I AM ALLOWED to MAIL OUT two FREE legal letters per WEEK. My limit For the WEEK ENDING JUly 17, 2021 WAS MET ON July 14, 2021 WHEN I submitted to FOUNTAIN MAIlROOM A letter to this COURt ENClOSING A MOTION FOR A TEMPORARY RESTRAINING ORDER AND SUPPORTING DECLARATION. styled BESSELAAR V. BUTLER IN WITCH I declared that I AM UNDER IMMINENT, immediate threat of SERIOUS physical INJURY, EVEN death, AND I supported that MOTION WITH letters THAT I HAVE WRITTEN to PRISON officials, VERIFIED by DECLARATION, AND Attached thereto.    4

I hereby INCORPORATE by REFERENCE HEREIN that DECLARATION AND the letters (FIVE (5) letters IN All) Attached AND REFERENCED thereto, TO THE CLAIM I AM MAKING IN this CASE.

Complaint: Section G    Claim...

1) On June 1, 2021 Plaintiff was transferred from Draper Covid-19 intake quarantine in Elmore, Alabama to Fountain Correctional Center (FCC) in Atmore, Alabama.

2) Plaintiff is serving a life sentence pursuant to a conviction for Burglary in Baldwin County, Alabama in May, 1997.

3) Plaintiff is a Caucasian Male, Fifty-six years old, of a meek non-confrontational personality type. He has never been a member of any gang or organization. He has no tattoos, despite having spent most of his adult life in prison in Alabama.

4) Plaintiff has a parole consideration date of December, 2021.

5) Plaintiff has a clear prison record (no behavioral citations) of over nine (9) years.

6) Upon arrival at FCC on June 1, 2021 Plaintiff was assigned by the intake officer (presently John Doe) to J-Dormitory, bed 73A.

7) J-Dorm is one of four of FCC's primary housing units located in the main building of the prison. The other three primary dorms are G-Dorm, H-Dorm and I-Dorm.

8) G, H, I and J Dorms are open warehouse-style buildings each housing approximately 150 prisoners. Steel-frame bunk beds line the interior wall and single beds are situated in two rows the length of the middle areas of the dorms. Inmates create privacy enclaves by draping sheets along the feet of the bunk beds. These enclaves, known as "humps" in the current prison vernacular, serve to defeat observation by security cameras in the dorms.

9) Most of the crimes (assaults, rapes, stabbings, murders, drug sales, etc.) committed in these dormitories occur within the privacy of these humps.

10) Generally, one correctional officer (C.O.) is posted to each dorm. On weekends and holidays there is often staffing shortages at the prison which results in lengthy periods of time when no C.O. is in these dormitories.

11) When C.O's are present in these dorms he or she remains at the front of the dorm on a chair and walks only during inmate count times.

G-2

Complaint: Section G   Claim...

12) Upon entering J-dorm on June 1, 2021 Plaintiff, carrying his mat, bedroll and personal property, proceeded to bed 734. Another inmate was on the bunk and, after Plaintiff told him the bed had been assigned to himself, the inmate immediately became belligerant and told Plaintiff that "white boys" had to go to the T.V. room until "Bloods" decided where to put them.

13) After placing his things in the TV room Plaintiff went to the CO posted in the dorm and told her that another prisoner was on his assigned bed. As I was speaking several inmates, two of them with freeworld lock-blade knives tucked conspicuously in the waistbands of their uniform pants crowded up on us. The C.O. was obviously stricken with fear and told me to find somewhere else to go.

14) Upon returning to the TV room other inmates informed me that J-dorm was the "Blood" dorm and that, unless I just wanted to get killed, I had better shut up and do as I was told.

15) Over the next three weeks I was moved by Blood gang members to two different bunks. I was threatened with physical bodily harm almost every day. I was pushed around and cuffed about my head many times. I observed incredible acts of violence. There were around twenty Caucasians in the dorm, and six hispanics. All the rest were Black. Most, if not all, of the Black inmates in J-Dorm were Blood gang members. Most of the white guys were sex slaves to the Bloods. These sex slaves were beaten and raped almost every day. I saw CO's threatened and menaced with drawn knives for daring to ask certain Bloods to open their humps during headcounts. Most of the CO's who worked in the dorm took orders from Blood gang members. On several occasions the gang members told the CO's the cell count to prevent these officers from counting themselves because they had their sex slaves tied up on the floors inside their humps.

16) Over that three-week period Plaintiff made numerous efforts to get moved

G-3

Complaint: SECTION G CLAIM...

out of the dorm. I spoke with VARIOUS officers and staff and was told there was nowhere to move me, that the PRISON WAS OVERCROWDED And I would have to wait. I WROTE REQUESTS to WARDEN Butler asking to be moved AND describing the conditions in J-DORM. I NEVER got a RESPONSE FROM her.

17) By the WEEK ENDing JUNE 19, 2021 Plaintiff had learned that WARDEN Bulter had created "gang" dorms in AN effort to Reduce the INCidence of VIOlence at FCC. As trade-off she would allow the GANgs to RUN the dorm ASSIgned to them so long as they kept the VIOlence down. As INCENtive, she allows the gangs to ORGANIZE AND operate their criminal enterprises. GANG leaders WERE AND ARE Allowed to possess and keep cellphones, weapons and drugs. They ARE given, IN MANY INSTANCES, AVthority over the RANK officers. OVER time these gangsters ORGANIZEd And by dint of income FROM their VARIOUS vices (drug sales, phone Skits, extortions, etc) became wealthy and powerful. MANy have also Received stimulus checks due to CORONAVIRUS.

18) The VAST majority of the Staff at FCC FEAR these gangsters And do nothing to oppose them. Most of the crime committed at FCC is purposely not Reported or Recorded. White INMates ARE ROUtiNely targeted For Attack. It has become a Sport at this prison to terrorize white INMAtes. MANy of the staff ARE ENtertained by this conduct.

19) There ARE other, smaller housing units at FCC. These ARE OVERwhelmingly occupied by elderly CAVCASIAN prisoners. These SEMi-SAFE havens ARE OVERCROWDED.

20) MANy of the gang members ARE transfers From Holman prison who have Life without pardle sentences For murder convictions. FCC is A VERitable paradise to these prisoners. G.K.Fountain NEVER SAW this coming, NEVER even knew what hit him. This was a Level 4 Medium security prison

G-4

COMPLAINT: SECTION G    CLAIM...

wholly UNPREPARED to MANAGE the ONSLAUGHT of the level of chaos that INEVITABLY CAME to town. Having SPENT MANY YEARS AT HOLMAN PRISON SERVING ON A life without PAROLE SENTENCE PlAINTIFF is closely familiar with the MINDSET of A MAN with such a CURSE. The REAL OG's CAME IN AND drew the schoolyard WANNABE "studio" thugs to them like shavings to a MAGNET. Now they're All "shooters" (eugh!) AND they have plenty of knives to go AROUND. Packages of cellphones AND dope, brought in by. Some of the officers PERIODICALLY, include 6 to 8 inch lockblade KNIVES. I NEVER SAW ONE but I was told by several INMATES that there WERE GUNS IN the POSSESSION of some of the GANGS.

21) PETITIONER WROTE A letter to WARDEN Butler, SEALED it IN. AN ENVELOPE AND placed it IN her box outside of the chow hall. [FN.1] IN this letter, which is dated JUNE 14, 2021, I DESCRIBED AS ABOVE the conditions AND CIRCUMSTANCE ATTENDING MY EXPERIENCE IN J DORM AND FCC up to that day. I NEVER RECEIVED A REPly to that letter.

22) ON JUNE 19, 2021 PlAINTIFF was ACCOSTED IN J dorm by three INMATES, two black gang MEMBERS AND A CREOLE-looking guy. All three were ARMED with lockblade KNIVES AND the CREOLE put his, blade Fully EXTENDED AND Locked, to my throat so that I FELT the edge CONTACT my skin — All the way ACROSS. I was ORDERED to get on A cellphone, call my folks AND get SOME MONEY SENT to A CASH-OUT. BECAUSE I OWED them FOR A "PACKAGE" I "stole" FROM where it

FN. 1 this box had a hinged lid AND clasp AND a padlock SECURED the box.

G-5

had been secreted around my bed, they said. I knew nothing about it. I don't know why the pretext. Totally unnecessary. I went with them into a hump and got on the phone. One of them offered me. I was terrified and thought I was going to have a heart-attack. But I managed to dial a number that rang to voice mail. I contrived a story in which I bought time. I agreed, only under this compulsion - not willingly - to get the money they were demanding. By the skin of my teeth was I able to escape this trap.

12) By Monday, June 21, 2021, when lunch was finally called for J Dorm and I could get out I slipped off to Captain McKenzie's office and told him about the extortion and knives and he sent me to the Ristrictive Housing Unit (RHU) for placement into investigative hold status. I told him where my property was in J dorm but he was unable to retrieve it because the thug that was on the bed next to the one I had been placed on by the Bloods, one of the guys who had been threatening me, threatened to set McKenzie afire. He had gasoline and a lighter. After more co's arrived this inmate was placed into the RHU, where he bruited about that I had ratted him out and he would pay a thousand dollars to anyone who could get a knife in Plaintiff. A three-foot length of 2x4 was also seized from this inmate's lock-box.

18) With nothing but the prison uniform I was wearing I was placed into a cell with another inmate. I had no idea, at that time, that I had

G-6

just gone from the frying pan into the fire. My new cell mate was a 36 years old black man with obvious mental issues. In the cell right next me was one of the top Crips at FCC. He was (is) in the RHU because he attempted to murder a white inmate while he was in FCC general population. He had (has) a cellphone in his cell and I could (can) hear most of his phone conversations. He is so arrogant and cocksure of his sacred cow status that he often puts it on speaker and stands at the bars of his cell talking for hours on it — and every officer who works in the unit knows he has it and walk by him or even stop to talk with him — while he is on his phone. The whole administration at FCC (wardens, captains, lieutenants and sergeants) is fully aware that this heavy-weight Crip leader has the cellphone. Most of them know he has a knife in his cell also.

18) Cellphones at FCC are contraband and it is statutorily illegal for any Alabama state prisoner to possess one. Likewise, knives and weapons are illegal and unlawful for a prisoner to have.

20) This Crip leader is one of the Holman OG's (old gangster) transferred to FCC when Holman was condemned and partly shut down. He will never get out of prison — unless he escapes — and he knows it. His latest victim was butchered so brutally he had to be life-Flighted to a Freeworld hospital. He gained superstar status in the gang's eyes and often exults in bragging about it often. In fact, many of the FCC staff actually grovel before this inmate.

21) This Crip gang leader is named Chandler and goes by the nickname 'popa Chopper.' (Because, he says, every time he "pops" one (stabs) he sends them out on the chopper (Life-Flight helicopter). He is a brutal psychopath who glories

G-7

And hurting other people - especially "CRACKERS" (pejorative slang for white people) as he loves to boast.

22) Most gang members at FCC are black. And many of them viciously racist and see white people as prey. Overt and aggressive racial animus is a motivating factor in much of the violence pervading FCC at the present time. Internicine gang warfare is also a force driving the incidence of prisoner on prisoner assaults and murders to unconscionable levels of vileness and frequency. Three inmate on inmate murders have taken place at FCC just this year, the last one just a few days ago. I'm told there have been hundreds of serious ly injurious stabbings this year alone as well. I have personally witnessed several since I've been here. And other assaults and beatings occur almost on a daily basis. But many are not reported by FCC staff - possibly in a effort to artfully minimize the severity and actual frequency of incidents of violence and so reduce their liability - but more likely because they fear reprisals from the gangs.

23) Inmate Chandler uses his cellphone to call other prisoners both here at FCC and around the state. Because many prisoners in prisons throughout Alabama, even county jails, have illegal cellphones gangs have been enabled to organize loosely but in an evil network, throughout the state's prison system. I have sat in my cell and listened as Chandler ordered hits at other prisons and at FCC. All of the gangs at this prison have such networks.

24) Internet "cash-out" apps are commonly used to buy and sell. Instant money transfers enable large volumes of economic exchange and enriches and strengthens the gangs at FCC and throughout the state's prison system.

25) Efforts, if any, made by FCC staff to seize cellphones from

inmates is mere window-dressing. There are several CO's at FCC who comport themselves like gang members, ingratiate themselves with the top gang leaders and run cellphone skits with them. A typical such skit involves a prisoner targeted as weak but having access to money (such as many of the white inmates, who are prime targets). A gang member offers the victim selected a free call. While the inmate is on the phone the guard, being signalled, walks down on the guy and seizes the phone. Because the guy "got" the thug's phone "took" he has to pay for it. The conspiring officer gives the phone back to the thug later and the two split the money the victim pays. The basic cost of a cellphone in here is on average eight-hundred dollars. Petitioner has reason to believe, on compelling evidence, that Warden Butler and other administrative staff at FCC know and do nothing about skits of this nature.

24) Inmate who have been victims of cellphone (and other kinds of skits) skits but were unable to pay or pay the full amount have been beaten severely, stabbed and otherwise violently hurt on many occasions at FCC and throughout the state's prison system. Evidence that incompetent top level prison administrators are deliberately indifferent to the injuries their inept management policies and practices are causing is inherent at Limestone prison in Northern Alabama. There, a different management philosophy obtains. For many years Limestone has been famous for having few, if any, drugs, cellphones or weapons. Consequently, the incidence of violence at Limestone so low as to be in marked contrast to the rest of Alabama's prisons. The reasons for this disparity explain why most of the state's prison system is so

G-9

violent. Cellphones, drugs and weapons are ubiquitous and plentiful in every prison in Alabama where high or frequent incidents of prisoner on prisoner violence is out of control. Prison officials, including current Commissioner and defendant herein Jefferson Dunn, know this. Thus, their failure to effect realistic interdiction policies or to enforce existing methods and policies aimed at reducing the levels of drugs, cellphones and weapons in many of Alabama's prisons evince a deliberate indifference, even a callous disregard for the welfare and safety of the prisoners under their ward.

27) Familiarity is said to breed contempt. But in the prison context men and women who work around the same prisoners for many years develope bonds with certain inmates. Such bonding undermines prison security by compromising the officers. A periodic rotation of officer (co's) and upper level administrators to different prisons would reduce the breakdown. I see it as a "familiarity syndrome" which erodes the proper relationship that should exist between correctional employee and convict. A relationship where the employee has no reluctance to enforce the prisons' rules without regard to who the prisoner is.

28) Attenuating, even abating, the familiarity syndrome by periodic rotation is something Alabama's prison officials could do — but they never will. The system is too entrenched and most upper level administrators are arrogant and obstinant.

29) On June 27, 2021 Plaintiff wrote a letter to his FCC institutional classification officer, Mrs. Cunningham, describing various security breaches by RHU officers which posed an increase in risk to his personal safety. This letter included an anecdotal description of a threat made to him by his cellmate, Timothy Hudson, who had threatened to stab Plaintiff in his neck with a sharpened pen while Plaintiff slept. The letter also included description of a cellphone exchange Plaintiff overheard made by Crip leader Chandler about an escape plot planned by gang members where they planned to start a riot in general population and use same to effect a mass escape sometime this summer.

30) On June 28, 2021 Plaintiff spoke with FCC psychological associate, C. Murphy and informed him of the escape plot and the threats made against Plaintiff by Hudson. In addition Plaintiff told Murphy that, due to systemic security breaches by the RHU officers, Plaintiff believed that he was not safe and was under such stress he was at the point of nervous breakdown. Plaintiff asked Murphy to advise Warden Butler of his disclosures.

31) On June 29, 2021 Plaintiff was assaulted in his cell by an inmate hallrunner he knew by the name of "Shawn." This inmate is a black Crip member who was (is) assigned to cell C-17 (right next to Plaintiff's cell) (Plaintiff has since learned the inmate's name is Demetrius Burton). In violation of RHU regulations Burton was allowed to remain out of his cell 24 hours per day ostensibly to clean the tiers, serve meals, and run errands for the prisoners in the unit. In fact, Burton took orders from Crip leader Chandler and spent most of his time doing his bidding - which included serving the Crip gang members in the unit by charging their phones, passing knives and phones amongst them and assaulting prisoners by throwing boiling water mixed with powder hair depilator, bleach and bodily fluids onto them through the bars of the cells.

32) On this occasion the assault was initially directed at Timothy Hudson, who, due to his mental illness was prone to violent (generally verbal), spontaneous outbursts, especially when he had not had a cigarette to smoke for several days. Because the cells are very small (6'x9')(or 54 square feet) Plaintiff

G-11

was, incidentally, dashed as well. When Plaintiff protested Burton state to him, "F--- you, Cracker, I'll burn your b---- a-- too." He then went into his cell, where he kept a gallon of undiluted bleach, filled a container, came back to the front of Plaintiff's cell and slung the bleach onto Plaintiff's body. The bleach burned the skin on much of Plaintiff's torso. Some got into his eyes and caused severe burning pain. The fumes made Plaintiff's lungs burn.

32) Plaintiff called out loudly for assistance from the RHU officer on duty. No one came. Plaintiff was then threatened with more bleach and told to keep his mouth shut. Crip Chandler was chortling and encouraging Burton the whole while. Hours later, when an officer came through the tier escorting a nurse for medications dispensations, Plaintiff began to relate to both of them what had happened, but Crip Chandler ordered the officer to ignore Plaintiff. Both the officer and the nurse immediately moved up the tier. Plaintiff was then told by Chandler that he, Chandler, ran the RHU and if Plaintiff tried to snitch on Crip then he would have Plaintiff killed.

33) Later that day Chandler, via his cellphone, learned of the thousand-dollar "hit" put out on Plaintiff by Aloysius "Thunder" Henry. It was from Chandler that Plaintiff learned of it. Later that evening Plaintiff wrote a second letter to Mrs. Cunningham, describing, inter alia, the assault and new threats and requesting "immediate transfer" from FCC and movement to a safer location.

34) On July 1, 2021 Plaintiff was escorted to an office in the administrative area of FCC and interviewed by a state police investigator. He told Plaintiff that Mrs. Cunningham had given my letter of June 27, 2021 to her immediate supervisor, FCC head of classification, Mr. Hoffman and that Mr. Hoffman had forwarded it to him. Although discussion was had about the threats to Plaintiff, this investigator was only interested in the escape plot I had described in the letter.

G-12

35) Upon being escorted back to the RHU officer L. Dailey, who often works as RHU officer and treats Chandler and Burton like beloved members of his own family, inquired of Plaintiff as to what I told the state investigators. Plaintiff did not respond to this query. This same evening the Riot team came onto C-Side of the RHU and searched the cells. After they left Burton told Chandler that Officer L. Dailey believed that Plaintiff was the cause of the search. Chandler then told Plaintiff that several officers, including Dailey and Foster, were Crip and that he could have Plaintiff's cell gate rolled open and could send "hitters" to kill Plaintiff and that unless Plaintiff kept his mouth shut he would do it.

36) On July 6, 2021 Crip Chandler and Burton execute a skit to get a Crip out onto the hallrunner job. Officer Dailey locks Trent White (a "Blood" gang member who was also a runner) and lets Crip Antoine "Itchy" Brown out as hallrunner. Now, Chandler has two "hitters" on the tier under his control. Plaintiff wrote a third letter to Mrs. Cunningham about this event, renewed his plea to be transferred or, at least, moved, and stated he was in fear of his life. Plaintiff received no response to this letter.

37) On July 8, 2021 Plaintiff mailed the three aforementioned letters to the U.S. District Court For the Southern District of Alabama as exhibits attached to a motion he also send requesting additional time to respond to a motion in Besselaar v. Stallworth, et. al., no, 1:21-cv-037-JB-MU. These letters were verified and appended to a sworn declaration made by Plaintiff describing his immediate circumstances and environment.

38) On July 9, 2021 an inmate housed in FCC RHU was violently attacked by another inmate. The victim was being escorded to the recreation yard. He was stabbed in his face and one eye was seriously injured. The hallrunner was not secured in his cell as per RHU regulation. Plaintiff wrote a fourth letter to Mrs. Cunningham on July 12, 2021 describing this event and several arsons that Chandler instigated on July 10, 2021 as well as another Bleach assault made on

G-13

Plaintiff by Chandler and Burton. Plaintiff received no response to this letter.

39) On July 11, 2021 a prisoner was ~~murdered~~ assaulted at FCC by other prisoners. That same day another stabbing occurred at FCC by gang members.

40) On July 13, 2021 inmate Tyrone Billups was murdered by gang members at FCC. A seperate stabbing (inmate on inmate) occurred the same day.

41) Plaintiff wrote and sent a fifth letter to Mrs. Cunningham describing continuing threats and assaults made against him by Chandler and Burton. No response was given.

42) On July 14, 2021 Plaintiff mailed a motion for a Temporary Restraining Order to the U.S. District Court for the Southern District of Alabama supported by a five-page sworn Declaration to which he verified and attached the two letter he had written (Plaintiff had made originals and carbon copies) to Mrs. Cunningham (the fourth and fifth letters)

43) Also on July 14, 2021 Plaintiff and Hudson were again assaulted by Chandler and Burton with bleach, hot water and urine thrown on them through the cell gate. At one point during this assault Hudson got too close to Chandler and Chandler stabbed him in his hand with a knife. Officer Foster observed this incident but did not report it. When the medication nurse (Adams) came to dispense Hudson his meds Hudson showed her his still bleeding hand, Foster told the nurse to ignore it. Later that day Chandler bragged about how he was able to stab Hudson on his hand to Foster. Foster laughed about it. On Hudson's behalf Plaintiff wrote a note to Warden Butler directly about the stabbing but Warden Butler did not respond.

44) On July 16, 2021 Chandler, Burton and Brown (Itchey) pelted Plaintiff with various objects and liquids through the cell bars. Chandler offered money to Hudson to stab me. The CO on duty in the RHU, Z. Hard observed this assault. Plaintiff demanded to be moved. This was conveyed to Lt. Smith. Plaintiff demanded to be seen by medical staff. These requests were not granted.

45) On July 16, 2021 Officer Nelson was escorting a hand-cuffed prisoner (K.O.) to

His RHU cell. Against regulation the hallrunners were not secured in their cells. Inmate Brown (itchey) ran up and began stabbing inmate K.O. with the same knife Crip Chandler had used to stab Hudson in the hand. Officer Nelson managed to get the knife from Brown and C.O. Hollis assisted in seperating Brown from K.O. This event occured just outside Plaintiff's cell and Plaintiff observed the entire scenario. Crip leader Chandler ordered the "hit". Chandler then told C.O. Nelson to cover the matter up. However, due to the injuries inflicted on K.O. Nelson was compelled to take K.O. to FCC infirmary. Inmate Brown was locked into his cell (C-20) (two cells down the tier from Plaintiff) and removed from his "hallrunner" job. Brown did not receive a write up for this conduct. C.O. Nelson later explained to Chandler that, under the circumstances, that was the best he could do. Deputy warden Antonio McClain came onto the tier and told inmate Burton that he had watched the assault on his office computer. There is a security camera on each RHU tier. Every event stated in this complaint is video-recorded.

49) Also on July 16, 2021 Classification Mr. Hoffman toured the RHU and spoke briefly with Plaintiff. He was very circumspect and, sotto voce, told Plaintiff that he had received all five of the letters Plaintiff had written to Mrs. Cunningham and that they had all been "forwarded to the appropriate authorities." Plaintiff then asked him why was he still at FCC? Mr. Hoffman shook his head and walked away.

50) As of this writing (July 17, 2021 at around 8:30 P.M.) Plaintiff is yet in cell C-18 of FCC's RHU and living under the same threat to his safety. He plans to send this complaint to the U.S. District Court, Southern Dist. of Alabama on Monday July 19, 2021.

G-15

## III. **PARTIES.**

A. <u>Plaintiff</u> (Your name/AIS): _Tracy H Besselaar # 135043_

    Your present address: _Fountain 3800 Atmore, AL 36503_

B. <u>Defendant(s)</u>: _See pages Attached._

1. Defendant (full name) _____ is employed as _____ at _____.

    His/her present address is _____.

    (a) Claim against this defendant: _____

_____.

    (b) Supporting facts (Include date/location of incident):

_____
_____
_____

2. Defendant (full name) _____ is employed as _____

at _____.

    His/her present address is _____.

    (a) Claim against this defendant: _____

_____.

    (b) Supporting facts (Include date/location of incident):

_____
_____
_____

3. Defendant (full name) _____ is employed as _____

at _____.

    His/her present address is _____.

Parties...

## Reosha Butler

1) Reosha Butler is the warden at Fountain Correctional Center (FCC). Her duties and responsibilities include enforcement of a Constitutional and state law barring the infliction of Cruel & unusual punishment on the prisoners under her ward.

2) Defendant Butler was at all times mentioned herein, was acting under color of state law. She is being sued in Both her official and her personal capacities.

3) Defendant Butler has subjected Plaintiff to inhumane conditions of confinement in violation of his right under the Eighth (8th) amendment to the U.S. Constitution. She is responsible for creating and tolerating a substantial and pervasive risk of serious harm posed to Plaintiff's person to which she was deliberately indifferent, causing Plaintiff to suffer both physical bodily injury as well as psychological injury.

## Jefferson Dunn

1) Jefferson Dunn is commissioner of the Alabama Department of corrections (ADOC). His duties include enforcement of all law and constitutional requirement appurtaining to the administration of the ADOC and contractees.

2) At all times mentioned herein defendant Dunn was acting under color of state law and is being sued in both his official and his personal capacities.

3) Defendant Dunn has created and tolerated a substantial and pervasive risk of serious harm to prisoners from other prisoners all across the ADOC, including Fountain Correctional Center (FCC), to which harm he has been and is being deliberately indifferent, and this indifference is a direct and indirect cause of the harm, causing Plaintiff to suffer both physical bodily injury and psychological trauma.

1) JANE DOE IS EVERY FEMALE EMPLOYEE OF THE ADOC WHO WAS AWARE OF THE SUBSTANTIAL AND PERVASIVE RISK OF SERIOUS HARM POSED GENERALLY, AND TO PLAINTIFF SPECIFICALLY, BY PRISONER AGAINST PRISONER ASSAULTS, AND IS DELIBERATELY INDIFFERENT TO SAID RISK OF HARM, CAUSING PLAINTIFF TO SUFFER PHYSICAL AND PSYCHOLOGICAL TRAUMA AND PAIN. ALL JANE DOE WERE ACTING UNDER COLOR OF STATE LAW AND ARE SUED IN THEIR OFFICIAL AND PERSONAL CAPACITIES.

JOHN DOE

1) JOHN DOE IS EVERY MALE EMPLOYEE OF THE ADOC WHO WAS AWARE OF THE SUBSTANTIAL AND PERVASIVE RISK OF HARM POSED GENERALLY, AND TO PLAINTIFF SPECIFICALLY, BY PRISONER AGAINST PRISONER ASSAULTS, AND WAS (AND IS) DELIBERATELY INDIFFERENT TO SAID RISK OF HARM, CAUSING PLAINTIFF TO SUFFER PHYSICAL AND PSYCHOLOGICAL PAIN AND TRAUMA. ALL JOHN DOS ARE SUED IN BOTH INDIVIDUAL (OR PERSONAL) AND OFFICIAL CAPACITIES AND ALL WERE ACTING UNDER COLOR OF STATE LAW THROUGHOUT ALL TIMES MENTIONED HEREIN.

(a) Claim against this defendant: _____

_____.

(b) Supporting facts  (Include date/location of incident):

_____

_____

_____

C. <u>Additional Defendants</u>:  (If there are additional defendants, you may list them on separate pages using the same outline above).

IV.  A.  You must answer the following questions:

    1.  State the conviction(s) for which you are presently incarcerated: _Burglary_____

_____.

    2.  When were you convicted?  _May, 1997_____

    3.  What is the term of your sentence?  _Life_____

    4.  When did you start serving this sentence?  _August, 1997_

    5.  Do you have any other convictions which form the basis of a future sentence?
       Yes ( )      No (✓)

If so, complete the following:

(a)  Date of conviction: _____

(b)  Term of sentence: _____

6.  What is your expected end of sentence (E.O.S.) date?  ____N/A_____

B.  If this present lawsuit concerns your criminal conviction or sentence, state whether your conviction has been:

|  | Conviction | Sentence |
|---|---|---|
| Reversed | yes( ) no( ) | yes( ) no( ) |
| Expunged | yes( ) no( ) | yes( ) no( ) |
| Invalidated | yes( ) no( ) | yes( ) no( ) |

6

Writ of habeas   yes( ) no( )      yes( ) no( )
corpus granted

C. If you answered yes to any of the questions, state the Court or entity that relieved you from your conviction or sentence and the date: _____

_____

**V.** State <u>briefly</u> exactly what you want the Court to do for you if you win (make no legal argument, cite no cases or statutes):

*SEE ATTACHED.* _____

_____

**VI. <u>AFFIRMATION</u>.** By my signature below, I swear or affirm under penalty of perjury that the facts set out in this complaint are true and correct.

July 17, 2021
Date

Tracy Besselaar
(Signature of Plaintiff Under Penalty of Perjury)

Fountain Box 3800
Current Mailing Address

Atmore, AL 36503

_____
Telephone Number

<u>PLAINTIFF SHALL IMMEDIATELY ADVISE THE COURT IN WRITING OF ANY CHANGE IN HIS ADDRESS, E.G., RELEASED, TRANSFERRED, MOVED, ETC. FAILURE TO NOTIFY THE COURT OF A NEW ADDRESS WILL RESULT IN THE DISMISSAL OF THIS ACTION FOR FAILURE TO PROSECUTE AND TO OBEY THE COURT'S ORDER.</u>

7

RELIEF REQUESTED...

1.) A temporary restraining order and preliminary injunction directing the defendants to immediately take action to secure Plaintiff's personal safety and place him in an environmet where his safety is not unconstitutionally at Risk to serious harm.

2) A Jury trial on all triable issues.

3) A permanent, or long-lasting, injunction barring these defendants from operating the ADOC in violation to a prisoners right, under the 8th Am. to the U.S. Constitution, to be free from attack and assaults made by other prisoners.

4) A judgment declaring the defendants' conduct, as proven, violated the U.S. Constitution.

5) Nominal damages against each Defendant.

6) Compensatory damages against each Defendant.

7) Punitive damages against each Defendant.

9) Appointment of counsel

10) Any other or further relief the court deems appropriate.

TRACY BESSELAAR #135043
FOUNTAIN BOX 3800 (C-18)
ATMORE, AL 36503



$ 001.80⁰

TIME SENSITIVE.

CLERK OF THE COURT
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
155 St. JOSEPH STREET
MOBILE, AL 36602