IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CLAUDETTE MILLER, etc.,          )
                                 )
     Plaintiff,                 )
                                 )
v.                               )          CIV. A. NO. 21-0325-TFM-MU
                                 )
REOSHA BUTLER, *et al.,*         )
                                 )
     Defendants.                )

## REPORT AND RECOMMENDATION

This matter is before the Court on the Motion to Dismiss the Second Amended

Complaint (Doc. 81) by Defendants Butler, Dunn, McClain, Dailey, Nelson, Foster,

Hard, Hoffman, Cunningham, Smith, and McKenzie (Doc. 83), these Defendants' brief

in support of their motion (Doc. 84), Plaintiff's response to Defendants' motion to

dismiss (Doc. 89), and Defendants' reply to Plaintiff's response (Doc. 90). This motion

has been referred to the undersigned Magistrate Judge for entry of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. Gen LR

72(a)(2)(S). Upon consideration of all relevant filings in this case and the applicable law,

the undersigned recommends that Defendants' motion to dismiss be **GRANTED, in**

**part,** and **DENIED, in part,** as set forth herein.

## I.  FACTUAL ALLEGATIONS

On February 19, 2024, Plaintiff Claudette Miller, as next of kin and administrator

of the estate of Tracy Howard Besselaar, filed her Second Amended Complaint for

Damages (Doc. 81), which is now the operative complaint in this action. In her

complaint, Plaintiff set forth the following factual allegations[1] in support of the § 1983 claims under the First, Eighth, and Fourteenth Amendments, the § 1985 claim for civil conspiracy, and the state law claims under Alabama's wrongful death statute that she has asserted in this action:

Plaintiff Claudette Miller is the next of kin and Administrator of the Estate of Tracy Howard Besselaar, an Alabama state inmate who died on July 19, 2021, at Fountain Correctional Facility. (Doc. 81 at 5). Besselaar, who was a 56-year-old Caucasian male, had a parole consideration date of December 2021, had never been a member of any gang or organization, had a clear prison record of over nine (9) years, with no behavioral citations, and had no history of opiate abuse while in prison. (*Id.* at 5-6). On June 1, 2021, Besselaar was transferred from Draper COVID-19 Intake Quarantine in Elmore, Alabama to Fountain Correctional Facility ("Fountain") in Atmore, Alabama and assigned by the intake officer to J-Dormitory, Bed 73A. (*Id.* at 11).

J-Dorm is one of four of Fountain's primary housing units located in the main building of the prison. (*Id.*). G, H, I, and J Dorms are open warehouse-style buildings, each housing approximately 150 inmates. (*Id.* at 12). Steel-frame bunk beds line the interior walls and single beds are situated in two rows, the length of the middle areas of the dorms. (*Id.*). To create privacy and hide from security cameras, inmates at Fountain draped sheets along the feet of the bunk beds, creating "humps" within the prison. (*Id.*). Crimes such as assaults, rapes, stabbings, murders, and drug sales occurred within the

---

[1] The Court recognizes that Defendants dispute many of these alleged facts; however, for consideration of this motion to dismiss, Plaintiff's factual allegations must be accepted as true and viewed in the light most favorable to Plaintiff. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).

privacy of the humps. (*Id.*). Generally, one correctional officer ("CO") was posted to each dorm and this CO remained at the front of the dorm on a chair, except when walking through the dorm during inmate count times. (*Id.*). On weekends and holidays, there were often staffing shortages at the prison which resulted in lengthy periods of time when no CO was present in the dorm. (*Id.*).

Upon entering J-Dorm on June 1, 2021, Besselaar, carrying his mat, bedroll, and personal property, proceeded to Bed 73A. (*Id.* at 13). Another inmate was on the bunk and, after Besselaar told him the bed had been assigned to him, the inmate became belligerent and told Besselaar that "white boys" had to go to the TV room until "Bloods" decided where to put them. (*Id.*). After placing his things in the TV room, Besselaar went to the CO posted in the dorm and told her that another prisoner was on his assigned bed. (*Id.*). As Besselaar was speaking, several inmates, two carrying lock-blade knives from outside of the prison tucked conspicuously in the waistbands of their uniform pants, approached and crowded Besselaar and the CO. (*Id.*). The CO told Besselaar to find somewhere else to sleep. (*Id.*). When he returned to the TV room, other inmates told Besselaar that J-Dorm was the "Blood" dorm and, that unless Besselaar wanted to get killed, he should shut up and do as he was told. (*Id.* at 14). Over the course of the next three weeks, Besselaar was moved by Blood gang members to two different bunks. (*Id.*). The Bloods threatened Besselaar with physical bodily harm almost every day, pushed him around, and cuffed him about his head. (*Id.*).

During his first three weeks at Fountain, Besselaar observed acts of violence. (*Id.*). The J-Dorm consisted of around 20 white inmates, 6 Hispanic inmates, and the remaining inmates were black. (*Id.*). Many of the black inmates in the J-Dorm were

Blood gang members. (*Id.*). The Bloods used most of the white inmates as "sex slaves" and beat and raped them almost every day. (*Id.* at 15). Besselaar saw COs threatened and menaced with drawn knives for asking certain Bloods to open their humps during head counts. (*Id.*). The Blood gang members did so because they did not want to open their humps where they had their sex slaves tied up on the floors inside. (*Id.*). Most of the CO's who worked in the J-Dorm took orders from the Blood gang members. (*Id.*).

Within the first three weeks of his arrival at Fountain, Besselaar spoke with various officers and staff requesting to be moved out of J-Dorm, and these officers and staff told him that he would have to wait to be moved because there was nowhere to move him due to overcrowding. (*Id.* at 15-16). On June 14, 2021, Besselaar wrote a letter to Warden Butler describing the conditions and his experience in J-Dorm and requesting to be moved. (*Id.* at 16, 23). He sealed the letter in an envelope and placed it in her box outside of the mess hall, but never received a response. (*Id.* at 23).

In January of 2020, the maximum-security prison near Fountain, Holman Correctional Facility, was closed and many of its inmates who were serving life without parole sentences were transferred to Fountain, which was a Level 4 medium security prison. (*Id.* at 18-19). Many of these inmates were gang members. (*Id.*). By the week of June 19, 2021, Besselaar had learned that Warden Butler had segregated the dorms at Fountain by gang affiliation in an effort to reduce the incidents of violence. (*Id.* at 17). According to Besselaar, Butler allowed the gangs to organize and "run the dorm assigned to them" if they kept the violence down. (*Id.*). Butler allowed gang leaders to possess and keep cellphones, weapons, and drugs. (*Id.*). And, in some instances, gang members had authority over ranked officers. (*Id.*). These gang members received

4

income from various enterprises, including drug sales, phone scams, extortions, and coronavirus stimulus checks and became "wealthy and powerful." (*Id.* at 18). Most of the staff at Fountain feared these gang members and did nothing to oppose them. In part for this reason, most of the crime committed at Fountain was purposely not reported or recorded by the COs. (*Id.*). COs periodically brought in cellphones, drugs, and 6-8" lock blade knives for the inmates. (*Id.* at 19).

Internet "cash-out" apps were commonly used at Fountain to buy and sell. (*Id.* at 21). The Fountain staff made only nominal efforts to seize cellphones from inmates. (*Id.*). Several COs at Fountain comported themselves like gang members, ingratiated themselves with the top gang leaders, and ran cellphone skits with them. (*Id.*). A typical example of such a skit would involve targeting a prisoner who was seen as weak but having access to money. (*Id.*). In such a skit, a gang member would offer the victim inmate a free call and, while the victim inmate was on the phone, a guard would walk toward them and seize the phone from the inmate. (*Id.*). Because the guard took the gang member's phone, the gang members would insist that the victim of the skit pay to replace the phone. (*Id.*). The conspiring CO would give the phone back to the gang member later and the two would split the money paid by the victim. (*Id.* at 22). The cellphones at Fountain generally sold for about $800. (*Id.*). Inmates victimized by such skits who were unable to pay were severely beaten, stabbed, or otherwise violently injured. (*Id.*). Warden Butler and other administrative staff allegedly knew about these skits and did nothing to stop them. (*Id.*).

Most of the gang members at Fountain were black. (*Id.*). White inmates were routinely targeted for attack by these gang members, and many of the staff were

entertained by this conduct. (*Id.* at 18). According to Besselaar, when he wrote his first complaint on July 19, 2021, there had already been hundreds of stabbings that year, many of which were not reported by Fountain staff. (*Id.* at 20). There were several other, smaller housing units at Fountain that were overwhelmingly occupied by elderly white prisoners. (*Id.*). These housing units were overcrowded. (*Id.*).

On June 19, 2021, Besselaar was accosted in J-Dorm by three inmates, two of whom he described as black gang members and one as a "creole-looking guy." (*Id.* at 23). All three were armed with lock blade knives. (*Id.*). The creole man put his blade, fully extended and locked, to Besselaar's throat, and the inmates ordered Besselaar to get on a cellphone, call his parents, and get some money sent to a cash-out because, they claimed, he owed them for a package that he stole from where it had been secreted around his bed. (*Id.*). Besselaar had not stolen any package from the inmates. (*Id.* at 24). Besselaar complied and went with the inmates to a hump where one of them handed him a phone. (*Id.*). He dialed a number that rang and went to voicemail. (*Id.*). Besselaar agreed out of fear for his life to get the money the inmates were demanding of him. (*Id.*).

By Monday, June 21, 2021, when lunch was called for J-Dorm, Besselaar slipped off to Captain McKenzie's office and told him about the extortion and the knives. (*Id.*). McKenzie sent Besselaar to the Restrictive Housing Unit ("RHU") for placement into investigation hold status. (*Id.*). Besselaar told McKenzie where his property was in the J-Dorm, but McKenzie was unable to retrieve it because an inmate named Aloysius "Thunder" Henry, who was on the bed next to Besselaar's, had gasoline and a lighter and threatened to set McKenzie on fire. (*Id.* at 25). Several other COs were brought in

to gather Besselaar's belongings, and they placed Henry into the RHU. (*Id.*). A three-foot length of 2x4 was seized from Henry's lockbox. (*Id.*). Besselaar later learned that Henry told others that Besselaar had "ratted him out" and that he would pay a thousand dollars to anyone who could "get a knife" into him. (*Id.*).

The RHU at Fountain is divided into tiers, and there is a security camera on each RHU tier. (*Id.* at 26). Besselaar was placed in a cell in the RHU next to one of the "top Crips" at Fountain, a man named Chandler. (*Id.*). Besselaar was placed in a cell in the RHU with another inmate, a 36-year-old black man named Timothy Hudson who suffered mental health issues. (*Id.*). Due to Hudson's mental illness, he was prone to violent (generally, verbal) spontaneous outbursts. (*Id.*). Besselaar learned that Hudson's proclivity toward outbursts placed Besselaar's life in greater peril as gang reprisals against Hudson in the small, 54 square foot cell ended up harming Besselaar as well. (*Id.* at 27).

Chandler, who was one of the gang members transferred from Holman, had been placed in the RHU because he attempted to murder a white inmate while he was in the Fountain general population. (*Id.*). Chandler went by the moniker "Popa Chopper" because he claimed that each time he "popped" someone (stabbed them) they had to be sent out on the chopper (life flight helicopter). (*Id.*).  Chandler's most recent victim was butchered so brutally that he had to be transported by helicopter to a hospital outside of the prison. (*Id.*). Chandler had a cell phone, and he would put the cell on speaker and stand at the bars of his cell talking for hours. (*Id.*). Every officer who worked in the RHU knew Chandler had the cell phone and would walk by him without confiscating it. (*Id.* at 28). The officers would even stop to talk with Chandler while he

was on his phone. (*Id.*). Chandler used his cell phone to call other prisoners both at Fountain and around the state. (*Id.* at 29). Because many prisoners in prisons throughout Alabama, even county jails, have illegal cell phones, gangs have been able to organize loosely throughout the state's prison system. (*Id.*). Besselaar sat in his cell in the RHU and listened as Chandler ordered hits at Fountain and at prisons outside of Fountain. (*Id.*). The entire administration at Fountain, including wardens, captains, lieutenants, and sergeants, were fully aware that Chandler had a cell phone. (*Id.* at 28). Most of them were also aware that he had a knife. (*Id.*). He boasted frequently about harming other people, especially "crackers," a derogatory term he used for white people. (*Id.*).

On June 27, 2021, Besselaar wrote a letter to his Fountain Institutional Classification officer, Mrs. Cunningham, describing various RHU officer security breaches which posed an increased risk to Besselaar's personal safety. (*Id.* at 29). This letter described how Besselaar's cellmate, Timothy Hudson, made a threat to stab Besselaar in the neck with a sharpened pen while Besselaar slept. (*Id.*). The letter also described a cellphone exchange that Besselaar overheard, in which Chandler described an escape plot that he and other gang members were contriving. (*Id.* at 30). Chandler and these gang members planned to start a riot in the general population which would lead to a mass escape in the summer of 2021. (*Id.*). On June 28, 2021, Besselaar spoke with Fountain psychological associate C. Murphy and informed him of the escape plot and the threats that Hudson had made against Besselaar. (*Id.*). Besselaar also told Murphy that, due to systemic security breaches by RHU officers, Besselaar believed that he was not safe and was under such stress that he was at the

point of a nervous breakdown. (*Id.*). Besselaar asked Murphy to advise Warden Butler of his disclosures. (*Id.*). On June 24, 2021, Besselaar was assaulted in his cell by an inmate, Demetrius Burton, who was assigned to cell C-17, right next to Besselaar's. In violation of RHU regulations, Burton was allowed to remain out of his cell 24 hours per day, ostensibly to clean the tiers, serve meals, and run errands for the prisoners in the unit. (*Id.* at 31). In fact, Burton took orders from Chandler, and spent most of his time doing Chandler's bidding, which included serving the Crip gang members in the unit by charging their phones, passing knives and phones among them and assaulting prisoners by throwing boiling water mixed with powdered hair depilator, bleach, and bodily fluids onto them through the bars of the cells. (*Id.*). On this occasion, the assault was initially directed at Timothy Hudson, Besselaar's cellmate. (*Id.*). Because the cells are very small (six by nine feet across, or 54 square feet), Besselaar was incidentally dashed with the liquid as well. (*Id.*). When Besselaar protested, Burton stated to him, "Fuck you, cracker, I'll burn your bitch ass, too." (*Id.* at 32). Burton then went into his cell, where he kept a gallon of undiluted bleach, filled a container, came back to the front of Besselaar's cell, and flung the bleach onto Besselaar's body. (*Id.*). The bleach burned the skin on much of Besselaar's torso, got into Besselaar's eyes and caused severe burning pain. (*Id.*). The fumes from the bleach also caused Besselaar's lungs to burn. (*Id.*). Besselaar called out loudly for assistance from the RHU officer on duty, but no one came. (*Id.*). Burton then threatened the Besselaar with more bleach and told him to keep his mouth shut. (*Id.*). Chandler, in the next cell over, laughed and encouraged Burton the whole while. (*Id.*).

Hours later, when an officer came through the tier escorting a nurse for

medication dispensations, Besselaar began to relate to both the officer and the nurse how Burton had burned him. (*Id.* at 33). However, Chandler ordered the officer to ignore Besselaar, and both the officer and the nurse immediately moved up the tier. (*Id.*). Chandler then told Besselaar that he, Chandler, ran the RHU, and if Besselaar tried to snitch on a Crip, that he would have Besselaar killed. (*Id.*). Later that day, Chandler, via his cellphone, learned of the thousand-dollar "hit" put out on Besselaar by Aloysius "Thunder" Henry. (*Id.*). Besselaar learned from Chandler that this "hit" existed. (*Id.*).

Later that evening, Besselaar wrote a second letter to Mrs. Cunningham, describing, among many concerns, the assault, the new threats, and requesting immediate transfer from Fountain to a safe location. (*Id.* at 34). On July 1, 2021, Besselaar was escorted to an office in the administrative area of Fountain and interviewed by a state police investigator. (*Id.*). The investigator told Besselaar that Mrs. Cunningham had given his letter to her immediate supervisor, Fountain Classification Supervisor, Michael Hoffman, and that Hoffman had forwarded the letter to him. (*Id.*). Although they discussed the threats made to Besselaar, the investigator was only interested in the escape plot Besselaar had described in the letter. (*Id.*).

Upon being escorted back to the RHU, Officer L. Dailey, who worked as an RHU Officer regularly and treated Chandler and Burton like family, asked Besselaar what he had told the state investigators. (*Id.* at 35). Besselaar did not respond to Dailey's inquiry. (*Id.*). The same evening, the "Riot Team" came to the C-Side of the RHU and searched the cells. (*Id.*). After they left, Burton told Chandler that Officer L. Dailey believed that Besselaar was the cause of the search. (*Id.*). Chandler then told

Besselaar that several officers, including Dailey and Foster, were Crips, and that he could have Besselaar's cell gate rolled open, and that he could send "hitters" to kill Besselaar. (*Id.* at 35-36). Chandler told Besselaar that unless he kept his mouth shut, Chandler would make the call. (*Id.*).

On July 6, 2021, Chandler and Burton executed a skit to get a Crip member out onto the "hallrunner" job. (*Id.*). Officer Dailey let out Trent White (a Blood gang member) and Antoine "Itchy" Brown as hallrunners. (*Id.*). This meant that Chandler had two "hitters" on the floor under his control, enabling him to order attacks on Besselaar. (*Id.*).

Besselaar wrote a third letter to Mrs. Cunningham about this event, renewed his plea to be transferred, or, at least, moved, and stated he was in fear for his life. (*Id.*). Besselaar received no response to this letter. (*Id.*). On July 8, 2021, Besselaar mailed the three letters to the U.S. District Court for the Southern District of Alabama as exhibits to a motion he also sent, requesting additional time to respond to a motion in *Besselaar v. Stallworth, et. al.*, Case No. 1:21-cv-037-JB-MV. (*Id.* at 36-37). These letters were verified and appended to a sworn declaration made by Besselaar describing his immediate circumstances and environment. (*Id.*).

On July 9, 2021, an inmate housed in Fountain RHU was violently attacked by another inmate. (*Id.*). The victim was being escorted to the recreation yard. (*Id.*). He was stabbed in the face and one eye was seriously injured. (*Id.*). At the time, the hallrunner was not secured in his cell as per RHU regulations. (*Id.*).

Besselaar wrote a fourth letter to Mrs. Cunningham on July 12, 2021, describing this event and several arsons that Chandler instigated on July 10, 2021, as well as another bleach assault made on Besselaar by Chandler and Burton. (*Id.*). Besselaar

received no response to this letter. (*Id.*).

On July 11, 2021, a prisoner was assaulted at Fountain by other prisoners. (*Id.*). That same day, another stabbing occurred at Fountain, carried out by gang members. (*Id.* at 38). On July 13, 2021, inmate Tyron Billups was murdered by gang members at Fountain. (*Id.*). A separate inmate-on-inmate stabbing occurred the same day. (*Id.*).

Besselaar sent a fifth letter to Mrs. Cunningham describing the continuing threats and assaults he faced at the hands of Chandler and Burton. (*Id.*). Besselaar received no response to this letter. (*Id.*). On July 14, 2021, Besselaar mailed a motion for a temporary restraining order to the U.S. District Court for the Southern District of Alabama, supported by a five-page sworn declaration to which he verified and attached the two letters he had written to Mrs. Cunningham. (*Id.*).

Also on July 14, 2021, Besselaar and Hudson were again assaulted by Chandler and Burton with bleach, hot water, and urine thrown on them through the cell gate. (*Id.* at 39). At one point during this assault, Hudson got too close to Chandler and Chandler stabbed him in his hand with a knife. (*Id.*). Officer Foster observed this incident but did not report it. (*Id.*). When the medication nurse, Nurse Adams (FNU) came to dispense Hudson his medicine, Hudson showed her his still-bleeding hand. (*Id.*). Foster told the nurse to ignore it. (*Id.*). Later that day, Chandler bragged about how he was able to stab Hudson on his hand to Foster, and Foster laughed. (*Id.*). On Hudson's behalf, Besselaar wrote a note to Warden Butler directly about the stabbing, asking her to take action, but Warden Butler did not respond. (*Id.* at 40).

On July 16, 2021, Chandler, Burton, and Brown pelted Besselaar with various objects and liquids through the cell bars. (*Id.*). Chandler offered money to Hudson to

stab Besselaar. (*Id.*). The CO on duty in the RHU at the time, Officer Z. Hard, observed this assault. (*Id.*). Besselaar demanded to be moved and to be seen by medical staff. (*Id.*). These requests were conveyed to Lt. Smith. (*Id.*). They were not granted. (*Id.*).

On July 16, 2021, Officer Nelson was escorting a handcuffed prisoner who went by the moniker "K.O." to his RHU cell. (*Id.*). Against Fountain regulations, but in conformance with Defendant Butler's unofficial policies, the hallrunners were not secured in their cells. (*Id.* at 41). Brown ran up and began stabbing K.O. with the same knife that Chandler had used to stab Hudson in the hand. Nelson managed to get the knife from Brown and CO Hollis assisted in separating Brown from K.O. This event occurred just outside of Besselaar's cell while Besselaar watched. Chandler ordered the "hit" on K.O. Chandler then told CO Nelson to "cover it up." However, due to the severity of the injuries inflicted on K.O., Nelson was compelled to take K.O. to the Fountain Infirmary. Brown was locked in his cell, Cell C-20, which was two cells down the tier from Besselaar. Brown was removed from his "hallrunner" job. Brown did not receive a disciplinary write up for stabbing another inmate. (*Id.* at 42). Nelson later explained to Chandler that, under the circumstances, this was the best that he could do. (*Id.*). Deputy Warden Antonio McClain came onto the tier and told inmate Burton that he had watched the assault on his office computer. (*Id.*).

On July 16, 2021, Fountain Classification Supervisor Michael Hoffman toured the RHU and spoke briefly with Besselaar. (*Id.*). Hoffman seemed circumspect to Besselaar, and, in a low voice, told Besselaar that he had received all five of the letters that Besselaar had written to Mrs. Cunningham and that they had all been "forwarded to the appropriate authorities." (*Id.*). Besselaar asked to know, if this was the case, why he

was still at Fountain. (*Id.*). Hoffman simply shook his head and walked away. (*Id.* at 43).

Each Defendant in this case had personal and particular knowledge of the dangers to Besselaar. (*Id.*). Defendant Reosha Butler was aware that there were gangs present at Fountain. (*Id.*). Defendant Butler was aware that the Crips, Bloods, and Disciples were present at Fountain. (*Id.*). Defendant Butler stated that there were positive parts to gangs operating in a prison, and that gangs could "mentor in a positive way." (*Id.*). Defendant Butler was aware that gangs brought the risk of contraband into the prison. (*Id.*). Defendant Butler was aware that contraband, including drugs and cellphones, were present throughout the prison. (*Id.*). At all times relevant to the complaint, prison officials at Fountain regularly found contraband, such as drugs and cellphones, during searches of Fountain. (*Id.* at 44). Defendant Butler has postulated that "ninjas" and "potato cannons" are the source of the drugs in the facility. (*Id.*). Defendant Butler admitted that staff could be responsible for bringing drugs and contraband into Fountain. (*Id.*).

Fountain officials maintain an "incident module system" in which attacks on inmates are reported and prisoner concerns for their safety are logged. (*Id.*). As warden, Butler received notification of every incident of inmate violence or death. (*Id.*). As such, Defendant Butler received notice of each event of violence against Besselaar. (*Id.*). Defendant Butler has a dropbox in her office in which inmates may drop letters. (*Id.*). Defendant Butler received five letters from Besselaar in her dropbox, detailing his concerns for her safety. (*Id.*). The only actions Defendant Butler took to prevent violence at Fountain were "walking around," and "talking to inmates." (*Id.* at 45). Defendant Butler did not implement any programs at Fountain to decrease violence. (*Id.*). Defendant

Butler did not change any policies or procedures at Fountain to decrease violence. (*Id.*). Defendant Butler was aware that the DOJ determined that the conditions at facilities in the Alabama Department of Corrections ("ADOC") were unsafe for inmates. (*Id.*).

Defendant Dunn was aware that the DOJ determined that the conditions at facilities in the ADOC were unsafe for inmates. (*Id.*). Defendant Dunn did not implement any policy changes in the ADOC to address the violence and unsafe conditions. (*Id.*). Defendant Dunn was aware that prisons in the ADOC were understaffed and overcrowded. (*Id.* at 46). Defendant Dunn did not implement any policy changes in the ADOC to address the understaffing and overcrowding at the ADOC. (*Id.*). Defendant Dunn was aware that Brown's presence in the RHU posed a risk to Besselaar and others within the RHU. (*Id.*).

Defendant McKenzie was aware that Besselaar's life was at risk from gang violence because he observed Aloysius Henry threaten to set him on fire. (*Id.*). Defendant Nelson was aware that Besselaar's life was at risk from gang violence because he observed an inmate, Brown, attack another inmate while wandering freely through the RHU. (*Id.*). Defendant McClain was aware that Besselaar's life was at risk from gang violence because he observed an inmate, Brown, attack another inmate while wandering freely through the RHU. (*Id.*). Defendant McClain was aware that inmates were not meant to be permitted by policy to wander freely through the RHU. (*Id.*). Defendant McClain did not ensure that Brown was written up for his assault upon another inmate. (*Id.* at 47). Defendant Dailey was aware that Besselaar's life was at risk from gang violence because he let Trent White, a Blood Member, and Antoine "Itchy" Brown, a Crip Member, out into the hall of the RHU to move freely as hallrunners.

(*Id.*).

Defendant Michael Hoffman, the FCC Classification Supervisor, was aware that Besselaar's life was at risk from gang violence because he received and forwarded all Besselaar's letters to Mrs. Cunningham to Defendant Reosha Butler. (*Id.*). Defendant Hoffman spoke with Besselaar, telling him that he had received all his letters. (*Id.*). Defendant Cunningham was aware of the threat to Besselaar's life as she received at least 5 letters from Besselaar detailing the threats to his life. (*Id.* at 48).

Defendant Nurse Adams was aware of the threat to Besselaar's life as they observed Hudson's bleeding hand after the July 14, 2021, attack on Hudson and Besselaar. (*Id.*). Defendant Foster was aware of the threat to Besselaar's life because Foster observed the July 14, 2021, attack on Hudson and Besselaar. (*Id.*). Defendant Hard was aware of the threat to Besselaar's life as he observed Chandler and Burton and Brown pelting Plaintiff with objects and liquids through the cell bars and did nothing. (*Id.*). Defendant Lt. Smith was aware of the threat to Besselaar's life as he received Besselaar's requests on July 16, 2021, to be seen by medical staff and refused him medical treatment. (*Id.*).

Besselaar wrote in his first hand-written complaint that he planned to send the document to the U.S. District Court in the Southern District of Alabama on July 19, 2021. (*Id.* at 49). Besselaar died that same day, July 19, 2021. (*Id.*). When NBC News contacted the ADOC, the ADOC issued a statement confirming that Besselaar died at Fountain on July 19, 2021. (*Id.*). According to the statement, an autopsy determined that Besselaar died "from an accidental fentanyl overdose" on the same day he sent a complaint describing the unconstitutional practices at Fountain. (*Id.*).

Besselaar's family was never informed of his death. (*Id.*). The ADOC claims that Besselaar's body was buried in a corrections department cemetery after they were purportedly "unable to contact" Besselaar's next of kin. (*Id.*). No one from the ADOC or Fountain made any attempts to contact Besselaar's next of kin. (*Id.* at 50).

## II. <u>STANDARD OF REVIEW</u>

Defendants seeks dismissal of Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (citation omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.... [This standard] asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and must be a "'plain statement' possess[ing] enough heft to 'sho[w] that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 555, 557 (second brackets in original). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. In determining whether a claim is stated, the factual allegations are accepted as true, except for conclusory assertions or a recitation of a cause of action's elements, and the allegations must be considered in the light most favorable to the plaintiff. *See id.; Mitchell v. Farcass,* 112 F.3d 1483, 1490

(11th Cir. 1997).

In addition, "[a] complaint is subject to dismissal for failure to state a claim 'when its allegations, on their face, show that an affirmative defense bars recovery on the claim,'" *Douglas v. Yates,* 535 F.3d 1316, 1321 (11th Cir. 2008) (quoting *Cottone v. Jenne,* 326 F.3d 1352, 1357 (11th Cir. 2003)), or "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action," *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

### III.  LEGAL ANALYSIS

In Counts I though IV of her complaint, Plaintiff seeks redress for alleged constitutional deprivations pursuant to 42 U.S.C. § 1983. Specifically, in Count I, Plaintiff alleges that Defendants Butler, Dunn, McKenzie, Nelson, Dailey, Cunningham, Foster, Hard, and Smith, in their individual capacities, violated Besselaar's Fourth, Eighth, and Fourteenth Amendment rights; in Count II, Plaintiff alleges that Defendants Dunn, McKenzie, Nelson, Dailey, Cunningham, Foster, Hard. Butler, and Smith, in their individual capacities, failed to protect Besselaar thereby violating his Eighth Amendment rights; in Count III, Plaintiff alleges that Defendants Foster, Hard, Smith, and Nurse Jane Doe, in their individual capacities, violated Besselaar's Eighth Amendment rights by deliberate indifference to a serious medical need; and in Count IV, Plaintiff alleges that Defendants Butler and Dunn, in their individual capacities, violated his Fourteenth Amendment rights by committing affirmative acts which placed Besselaar in the position of actual, particularized danger by creating and exposing him to a danger that he would not have otherwise faced. (Doc. 81 at 50-59). In Count V of her complaint, Plaintiff

asserts a claim against Defendants Bulter, McKenzie, Nelson, Dailey, Foster, Hard, and Smith for conspiracy to deprive Besselaar of rights and privileges under 42 U.S.C § 1985. (*Id.* at 59-61). Plaintiff asserts a state law claim for wrongful death against all Defendants, in their individual capacities, in Count VI. (*Id.* at 61-65). Count VII, which is asserted against Defendants Bulter and Dunn, alleges a claim under § 1983 for failure to supervise. (*Id.* at 65-66). In Count VIII, Plaintiff alleges that Defendants Dailey and Nelson, in their individual capacities, violated Besselaar's First Amendment rights. (*Id.* at 66-68). Plaintiff seeks compensatory and punitive damages, as well as a declaratory judgment declaring that Besselaar's rights were violated. (*Id.* at 68).

Defendants seek dismissal on the following grounds: 1) Plaintiff's Second Amended Complaint is an impermissible shotgun pleading; 2) the newly-raised claims and newly-named Defendant in Plaintiff's Second Amended Complaint are barred; 3) Plaintiff's claim for declaratory relief based on violations of Besselaar's constitutional rights are moot; 4) Plaintiff fails to state a claim against Defendants Butler and Dunn, in their  official  capacities, for a violation of Besselaar's federal constitutional rights because they are entitled to Eleventh Amendment immunity; 5) Plaintiff fails to state a claim for violations of Besselaar's federal constitutional rights against the ADOC Defendants in Counts IV, V, VII, and VIII because, in their individual capacities, each ADOC Defendant is entitled to qualified immunity; 6) Plaintiff fails to state a claim against Defendants Butler and Dailey under the "State-Created Danger" theory in Count IV; 7) Plaintiff fails to state a claim against the ADOC Defendants for Conspiracy under 42 U.S.C. § 1985 in Count V; 8) Plaintiff fails to state a claim against Defendants Dunn and Butler for supervisory liability in Count VII; 9) Plaintiff fails to state a First

Amendment claim against Defendants Dailey and Nelson in Count VIII; and 10) Plaintiff fails to state a wrongful death claim against the ADOC Defendants for the same reasons she fails to state a constitutional claim against them, entitling them to state-agent immunity.

## A.  <u>**Shotgun Pleading Defense**</u>

The Eleventh Circuit has identified four main types of shotgun pleadings. *See Weiland v. Palm Beach Cty. Sheriff's Office,* 792 F.3d 1313, 1321-23 (11th Cir. 2015). This Court finds the Eleventh Circuit's recent analysis of these types of pleadings relevant here:

> *First*, the most common type is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. *Second*, the next most common type is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. *Third* is a complaint that does not separate[e] into a different count each cause of action or claim for relief. And *fourth*, we've described the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. ***The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.*** Dismissal on shotgun-pleading grounds is appropriate when "it is **virtually impossible** to know which allegations of fact are intended to support which claim(s) for relief. Here, [Plaintiff's] amended complaint lacks the defining feature of shotgun pleadings, as it is not "virtually impossible" to discern which factual allegations support each of [Plaintiff's] claims. To be sure, the complaint is certainly long and may not be a paragon of clarity. But that did not prevent the district court

> or the … defendants from understanding the basis of
> [Plaintiff's] core … claims…. And in our view, the allegations
> don't make it "virtually impossible" to identify the facts
> supporting each count…. In short, while the amended
> complaint may display some of the characteristics of what
> we have described as shotgun pleadings, we do not think
> the complaint fails to give the defendants adequate notice of
> the claims against them and the grounds upon which each
> claim rests.

*Inform Inc. v. Google LLC,* No. 21-13289, 2022 WL 3703958, at *4-5 (11th Cir. Aug. 26,

2022) (*per curiam*) (internal quotation marks and citations omitted) (emphasis added).

Having reviewed both parties' arguments and the complaint, the Court finds that

while, like the complaint in *Inform Inc.,* Plaintiff's complaint is "certainly long" and "may

display some of the characteristics of what [the Eleventh Circuit has] described as

shotgun pleadings," the complaint is clearly stated and gives "the defendants adequate

notice of the claims against them and the grounds upon which each claim rests." *See*

*id.; see also Ray v. Gadson,* No. 2:20-cv-00499-RDP, 2023 WL 7228933, at *3-5 (N.D.

Ala. Nov. 2, 2023) (denying motion to dismiss complaint as shotgun pleading when the

counts contained in the complaint, paired with the factual allegations, gave "ample

notice to the Supervisor Defendants of the factual basis for Plaintiff's claims against

them). Thus, the Court finds that the complaint is not subject to dismissal on this

ground.

## B. **"Newly" Added Claims and Defendants**

Defendants seek dismissal of what they have denominated "newly-raised claims"

and "newly-named defendants." In support of this argument, Defendants assert that

"Besselaar's initial complaint raised only three discernable claims: Eighth Amendment

deliberate indifference to a serious risk of harm, Eighth Amendment failure to protect,

and Eighth Amendment deliberate indifference to a serious medical need." (Doc. 84 at 11). They argue that Alabama's survivorship law, Ala. Code § 6-5-462, prohibits the survival of unfiled tort claims, including § 1983 claims, and therefore, all claims other than those set forth in Counts I, III, and III of the second amended complaint are due to be denied. They further argue that Besselaar's initial complaint was brought against only two defendants - Defendants Butler and Dunn - and that, because the requirements of fictitious party pleading under federal law have not been met, the claims asserted against Defendants Cunningham, Dailey, Foster, Hard, Hoffman, McClain, McKenzie, Nelson, and Smith are due to be dismissed. (*Id.* at 11-12).

Plaintiffs in response essentially argue, and this Court agrees, that Defendants have incorrectly interpreted the Alabama survivorship statute and its application to the claims set forth in the second amended complaint. Additionally, the Court finds that the defendants identified by Defendants as "newly added" were not in fact new but were included in the original complaint by name as having allegedly perpetrated wrongful acts against Besselaar. Thus, these defendants were never fictitious parties. Therefore, Defendants' discussion concerning fictitious parties is inapplicable here.

In *Estate of Gilliam ex rel. Waldroup v. City of Prattville,* 639 F.3d 1041, 1047 (11th Cir. 2011), the Eleventh Circuit explained that, under Alabama survivorship law "when an injured party actually files a § 1983 action and later dies, that action will survive death." (citing *Ga. Cas. & Sur. Co. v. White,* 582 So. 2d 487, 491 (Ala. 1991)). "So, when a § 1983 claim is actually filed prior to the victim's death, Alabama law provides compensation for the constitutional violation and imposes liability on the state official responsible for the unconstitutional conduct - a result consistent with the

purposes of § 1983." *Id.* Likewise, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala. Code § 6-5-410." *Id.*

The issue before this Court is whether the claims described as newly-raised claims; *i.e.,* Counts IV, V, VI, VII, and VIII, are prohibited by the Alabama survivorship statute. The Court may quickly dispose of this question regarding Count VI as it sets forth a cause of action for wrongful death under the Alabama wrongful death statute and, therefore, is not subject to the survivorship statute prohibition. *Id.* The question regarding the remaining claims is whether they (1) are not newly-raised at all because they were set forth in the original complaint or (2) whether they relate back to the filing of the original complaint and therefore escape the operation of the survival statute.

It is well settled that "[a] pro se pleading is held to a less stringent standard than a pleading drafted by an attorney" and must be "liberally construed." *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (citing *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003)); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers"). Indeed, pleadings of pro se plaintiffs are "given more leeway" and "looked at with special care." *Dean v. Barber*, 951 F.2d 1210, 1213 (11th Cir. 1992). Keeping these tenets in mind, the Court has carefully reviewed Besselaar's original complaint. (Doc. 1).

Unlike many pro se plaintiffs, Besselaar drafted a quite thorough complaint setting forth 14 pages of specific facts upon which his claims under § 1983 were based. (*See* Doc. 1 at 3-17). Having reviewed his original complaint and compared it to the

claims set forth by Plaintiff's counsel in counts IV, V, VII, and VIII[2] of the second

amended complaint, the Court finds that those claims were clearly included within the

original complaint. A pro se plaintiff is not expected to have the capacity to set forth

legal claims in legal vernacular and is, therefore, not required to do so. The question, in

reviewing a pro se complaint to determine whether it states a claim, is not whether it

sets forth the legal requirements to state a claim in legal terminology, but whether the

facts set forth in the pro se complaint support a plausible cause of action. In this case,

Besselaar's certainly met that standard. This is demonstrated by the fact that Plaintiff's

second amended complaint, which was drafted by an attorney, has for the most part set

forth the same facts as those set forth in Besselaar's pro se original complaint in

support of the causes of action set forth in counts IV, V, VII, and VIII.

Moreover, even if these claims were considered "new claims," they would not be

subject to dismissal under the Alabama survivorship statute. In *Georgia Casualty and*

*Surety Company v. White*, the Alabama Supreme Court stated that a new claim

asserted by the representative of an original plaintiff's estate is not prohibited by the

Alabama survivorship statute if the claim relates back to the complaint that had been

---

[2] In Count IV, Plaintiff alleges that Defendants Butler and Dunn, in their individual capacities, violated his Fourteenth Amendment rights by committing affirmative acts which placed Besselaar in the position of actual, particularized danger by creating and exposing him to a danger that he would not have otherwise faced. (Doc. 81 at 50-59). In Count V of her complaint, Plaintiff asserts a claim against Defendants Bulter, McKenzie, Nelson, Dailey, Foster, Hard, and Smith for conspiracy to deprive Besselaar of rights and privileges under 42 U.S.C § 1985. (*Id.* at 59-61). Count VII, which is asserted against Defendants Bulter and Dunn, alleges a claim, under § 1983, for failure to supervise. (*Id.* at 65-66). In Count VIII, Plaintiff alleges that Defendants Dailey and Nelson, in their individual capacities, violated Besselaar's First Amendment rights. (*Id.* at 66-68).

filed by the decedent prior to his death. 582 So. 2d 487, 492 (Ala. 1991). "For an amendment to a pleading to relate back to the original pleading, the claim asserted in the amendment must have arisen from the same conduct, transaction, or occurrence set forth in the original pleading." *Id.* (citing Ala. R. Civ. P. 15(c)). In this case, the claims set forth in Counts IV, V, VII, and VIII clearly arise from the same conduct and occurrences set forth in Besselaar's original complaint. Therefore, the Court finds that these claims escape operation of the survival statute.

The Court also finds that Defendants Cunningham, Dailey, Foster, Hard, Hoffman, McClain, McKenzie, Nelson, and Smith were not newly-added defendants so as to be subject to dismissal under the Alabama survivorship laws. Contrary to Defendants' argument, these Defendants were not substituted in place of fictitious defendants as they were known to and named by Besselaar in his original complaint. To be sure, Besselaar did not name them in the style of his action: however, applying the lenient pleading standard to his original complaint, as this Court must, the Court finds that Besselaar attempted to state claims against each of these Defendants by name in the body of his original complaint. (Doc. 1 at 5, 13-17). At the very least, the second amended complaint's clarification of the named defendants in this case, by specifically listing them as defendants, relates back to the filing of the original complaint and is saved from operation of the survivorship statute.

## C. **Declaratory Relief**

To the extent Plaintiff's second amended complaint seeks declaratory relief for alleged violations of Besselaar's constitutional rights, her claims are moot because Besselaar, by virtue of his death, is no longer in the custody of the Alabama Department

of Corrections. *See McKinnon v. Talladega Cnty., Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984). Accordingly, any claims for declaratory relief are due to be dismissed.

## D. <u>Official Capacity Claims</u>

To the extent Plaintiff is proceeding against Defendants Dunn and Butler in their official capacities, those claims fail.[3] The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998).  "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." *Id*. (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)). Accordingly, these two Defendants, both of whom were employed by the State of Alabama Department of Corrections at the time of the incidents alleged in the complaint, are immune from suit in their official capacities. *See Lancaster v. Monroe Cty, Ala.,* 116 F.3d 1419, 1429 (11th Cir. 1997). Thus, any claims against Defendants Butler and Dunn, in their official capacities, are due to be dismissed.

## E. <u>Qualified Immunity</u>

Defendants further assert that Plaintiff's claims for violations of Besselaar's constitutional rights set forth against Defendants in their individual capacities in Counts IV, V, VII, and VIII fail because they are entitled to qualified immunity on those claims.

---

[3] Plaintiff stated in her response that she has not sued Defendants Dunn and Butler in their official capacities and, thus, does not contest these Defendants' argument regarding official capacity claims. (Doc. 89 at 14, n.2). The Court briefly addresses this issue because Count VII of the second amended complaint did not specifically state in what capacity these two Defendants were sued in this count. (Doc. 81 at 65-66).

(Doc. 84 at 13-23). "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). "While the defense of qualified immunity is typically addressed at the summary judgement stage of a case, it may be ... raised and considered on a motion to dismiss." *St. George v. Pinellas Cty.,* 285 F.3d 1334, 1337 (11th Cir. 2002).

 As it is not disputed that Defendants were acting within the scope of their discretionary authority, Plaintiff must make two showings to overcome the defense of qualified immunity: 1) Plaintiff "must establish that the defendant violated a constitutional right" and 2) Plaintiff "must show the violated right was clearly established." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (internal quotation and citation omitted). Because it may exercise its discretion in deciding which prong to address first, *id.,* the Court will address whether Plaintiff has alleged the violation of a constitutional right against Defendants in Counts IV, V, VII, and/or VIII and then proceed to the second prong.

### 1. <u>Violation of Constitutional Right</u>

"In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." *Martinez v. Burns*, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005)). There is no dispute that the named Defendants, as employees of the Alabama

27

Department of Corrections, are state actors for purposes of this action.

### a. **State-Created Danger**

Count IV, which is asserted against Defendants Butler and Dailey under the Fourteenth Amendment, alleges that "Defendants committed affirmative acts which placed Besselaar in the position of actual, particularized danger by creating and exposing Besselaar to a danger that he would not otherwise have faced" and did so with "deliberate indifference to the known and obvious danger." (Doc. 81 at 58). Specifically, Plaintiff alleged that "Butler created 'gang dormitories,' where Besselaar was placed in actual, particularized danger of his life," and Dailey "released Trent White, a known Blood member, and Antoine 'Itchy' Brown, a known Crip member, as 'hallrunners' in the RHU, in order for Chandler to use these hall runners as 'hitters," assassins for the Crips, ... in violation of Fountain policies and knew of the particularized danger to Besselaar's life." (*Id.*). Defendants argue that these claims do not state a constitutional violation because "the state-created danger doctrine was a short-lived Fourteenth Due Process cause of action that no longer exists." (Doc. 84 at 14). Plaintiff contends that Defendants have misinterpreted the case they cite in support of this contention and cites numerous cases establishing that a state-created danger claim *in the custodial context* is alive and well. (Doc. 89 at 14-15).

The Court believes that a reference to the United States Supreme Court's opinion in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), in which the Supreme Court reiterated a state's constitutional responsibilities to inmates, is an appropriate place to start this analysis:

> [W]hen the State takes a person into its custody and holds
> him there against his will, the Constitution imposes upon it a

> corresponding duty to assume some responsibility for his
> safety and general well-being.... The rationale for this
> principle is simple enough: when the State by the affirmative
> exercise of its power so restrains an individual's liberty that it
> renders him unable to care for himself, and at the same time
> fails to provide for his basic human needs -- *e.g.*, food,
> clothing, shelter, medical care, and ***reasonable safety*** -- it
> transgresses the substantive limits on state action set by the
> Eighth Amendment and the Due Process Clause.

489 U.S. at 199-200 (citing *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("When a

person is institutionalized -- and wholly dependent on the state[,] … a duty to provide

certain services and care does exist.") (alterations in original)) (emphasis added).

In support of their position, in both their supporting brief **and** their reply brief,

Defendants cite and rely solely upon *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d

1300, 1305-06 (11th Cir. 2003), in which the Eleventh Circuit held that the state-created

danger doctrine is extremely limited in ***non-custodial*** settings and can only be a

substantive due process violation in those **non-custodial** settings if the act is so

egregious as to shock the conscience. The *Waddell* case, by its very language and

factual setting, clearly has no applicability to the instant case, which involves a decedent

who was in custody in a state correctional facility. Defendants inexplicably continued to

press this argument even though these correctional defendants and their counsel have

previously been advised in several decisions from our sister courts that *Waddell* is not

controlling law in the custodial setting. A learned reading of *Waddell* clearly supports no

other conclusion.

In one of the most recent cases addressing the state-created danger doctrine in

the custodial setting, the court held that "'[c]ustodial relationships' 'automatically give

rise to a governmental duty to protect individuals from harm by third parties under the

29

substantive due process clause.'" *Johnson v. Dunn*, No. 2:21-cv-1701-AMM, 2024 WL

1076802, at *20 (N.D. Ala. Mar. 12, 2024) (quoting *White v. Lemacks*, 183 F.3d 1253,

1257 (11th Cir. 1999)); *accord Pilcher v. Dunn*, No. 4:21-cv-204-ACA, 2023 WL

2756978, at *8 (N.D. Ala. Mar. 31, 2023); *Wilson v. Dunn*, 618 F. Supp. 3d 1253 (N.D.

Ala. 2022). Accordingly, contrary to Defendant's sole argument as to this claim, a cause

of action for state-created dangers in the custodial setting is valid. Defendants did not

argue that Plaintiff failed to allege a violation of Besselaar's constitutional right to be

protected from affirmative acts which placed him in danger by creating and exposing

him to a danger that he would not otherwise have faced with regard to the actions of

Butler and Dailey. The Court finds that Plaintiff has sufficiently alleged the violation of a

constitutional right in Count IV. Thus, the Court will consider the second prong of the

qualified immunity analysis below. *See, infra,* at 38-39.

### b. Conspiracy Under § 1985

In Count V of her complaint, Plaintiff asserts a claim against Defendants Butler,

McKenzie, Nelson, Dailey, Foster, Hard, and Smith for conspiracy to deprive Besselaar

of rights and privileges under 42 U.S.C § 1985. (*Id.* at 59-61). "Section 1985 provides a

way to redress conspiracies to violate civil rights." *Taylor v. Pekerol*, 760 F. App'x 647,

652 (11th Cir. 2019). A plaintiff alleging a § 1985(3) claim must allege facts that

demonstrate:

> (1) a conspiracy, (2) for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; and (3) an
> act in furtherance of the conspiracy, (4) whereby a person is either
> injured in his person or property of any right or privilege of a citizen of
> the United States.

*Id.* (quoting *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir.

1996)). "To establish a claim for conspiracy to violate constitutional rights under 42 U.S.C. § 1983, the plaintiff must show the existence of a conspiracy that actually deprived him of a specific constitutional right." *Id.* (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010)). In addition, the plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Childree,* 92 F.3d at 1147.

Plaintiff has alleged that Defendants Butler, McKenzie, Nelson, Dailey, Foster, Hard, and Smith unlawfully conspired with inmate gang members at Fountain to deprive Besselaar of equal protection of the law. Specifically, Plaintiff alleged that evidence of the conspiracy "includes all of the systemic breaches of security in Fountain, including the possession of contraband weapons and cellphones by inmates, the lack of supervision of the 'hallrunners' in the RHU, allowing those hallrunners free rein of the halls to assault Besselaar with boiling liquids and bleach on multiple occasions, failure to take steps to protect Besselaar from harm, and Besselaar's death on July 19, 2021, which Fountain entirely failed to report to his family." (Doc. 81 at 60).

Although a review of the facts set forth by Plaintiff shows examples of possible racial animus on behalf of certain inmates towards Besselaar, the allegations do not support a finding that Defendants Butler, McKenzie, Nelson, Dailey, Foster, Hard, or Smith were motivated to take the alleged actions attributed to them due to racially discriminatory animus towards Besselaar. While Plaintiff did allege that white inmates were routinely targeted for attack by black gang members, and many of the staff were entertained by this conduct, Plaintiff did not identify any of these Defendants as the staff members who were entertained by this conduct. (*Id.* at 18).

Plaintiff also alleged that inmate Chandler, one of the gang members transferred from Holman, had been placed in the RHU because he attempted to murder a white inmate while he was in the Fountain general population. (*Id.* at 27). Plaintiff further alleged that Besselaar sat in his cell in the RHU and listened as Chandler ordered hits at Fountain and at prisons outside of Fountain and that the entire administration at Fountain, including wardens, captains, lieutenants, and sergeants, were fully aware that Chandler had a cell phone and a knife. (*Id.* at 28-29). According to Plaintiff's allegations, Chandler boasted frequently about harming other people, especially "crackers," a derogatory term he used for white people. (*Id.*). Again, while these allegations may show that certain inmates were racially motivated, they are not sufficient to show racial discriminatory animus on the part of any of the Defendants named in this count.

The Court finds that Plaintiff has failed to sufficiently state a § 1985(3) claim for conspiracy to violate Besselaar's constitutional rights under 42 U.S.C. § 1983. Accordingly, Count V is due to be dismissed, without prejudice.

### c. Supervisory Liability

In Count VII, Plaintiff alleges that Defendants Butler and Dunn failed to supervise correctional staff at Fountain. (Doc. 81 at 65). Plaintiff alleges that Butler, as the Warden at Fountain, "had a custom or practice of allowing gangs to 'run' each dormitory, purportedly in exchange for the gangs keeping violence levels down." (*Id.*). Plaintiff also asserts that Dunn, as the Commissioner of ADOC, "had a custom or practice of allowing the ADOC to understaff and over-house Alabama prisons, as well as a custom or practice of misclassifying deaths as natural causes that were potentially unnatural, underreporting the violence in Alabama prisons." (*Id.*). Plaintiff further avers that Dunn

"had a custom or practice of being unwilling to prevent the introduction of drugs into prisons or adequately screen staff for drugs."  (*Id.*). Plaintiff further alleges that "[t]he DOJ's report on the ADOC and a history of widespread abuse by Correctional Officers and gang members at Fountain put Butler and Dunn on notice of substantial risk of serious harm to Besselaar and the need to correct the deprivation of rights to Fountain inmates, and Besselaar in particular." (*Id.* at 65-66). In addition, Plaintiff avers that Besselaar sent letters to Butler "describing the substantial risk of serious harm to his person from gang members and COs, thereby putting Butler on notice of the harm to Besselaar."  (*Id.* at 66). Plaintiff alleges that, with this knowledge and these customs and practices in place, Butler and Dunn knew that the COs at Fountain would place Besselaar in harm's way and failed to stop them from doing so, and therefore, Butler and Dunn allowed each agent of Fountain to violate Besselaar's constitutional rights. (*Id.*). Plaintiff concludes that Butler's and Dunn's "policy and practice, knowledge of danger to Besselaar, and complete failure to act to protect Besselaar was a proximate cause of Besselaar's injuries and ultimately, his death." (*Id.*).

To establish liability under 42 U.S.C. § 1983, a plaintiff must plead facts showing that each government-official defendant, "through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates based on *respondeat superior*.  *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999).  Thus, to establish a claim against a supervisory defendant, "a plaintiff must allege that the supervisor personally participated in the alleged unconstitutional conduct or that there is a causal connection between the actions of a supervising official and the

alleged constitutional deprivation." *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013). "Under the supervisory-causation framework, a supervisor may be liable for the actions of a subordinate ... when: (1) there is a history of widespread abuse putting the supervisor on notice to take action but he fails to do so, (2) a supervisor's custom or policy results in a subordinate's deliberate indifference to constitutional rights, or (3) the supervisor knew that subordinates would act unlawfully and failed to stop them from doing so." *Barefield v. Dunn,* __ F. Supp. 3d ___, 2023 WL 5417550, at *16 (M.D. Ala. Aug. 22, 2023) (citing *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (internal quotation and citation omitted). "Under [the "history of widespread abuse"] approach, '[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.'" *Ray v. Gadson,* No. 2:20-cv-00499-RDP, 2023 WL 7228933, at *5 (N.D. Ala. Nov. 2, 2023) (quoting *Hartley*, 193 F.3d at 1269). A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (holding that a custom requires showing a practice so settled and permanent that it takes on the force of law).

Defendants Butler and Dunn argue that Plaintiff's allegations are insufficient to establish 1) that ADOC officers at Fountain had a past pattern of constitutional violations that would have put them on notice of the need for corrective action or 2) that either of them was responsible for a custom or policy that resulted in deliberate indifference to Plaintiff's constitutional rights. (Doc. 84 at 19). At this stage of the

proceedings, this Court must disagree with Butler's and Dunn's argument. Without regard to the findings in the DOJ report and taking Plaintiff's allegations, which are set forth above, as true, the Court finds that she has sufficiently alleged a history of widespread abuse sufficient to notify each of them of obvious and continued constitutional deprivations occurring at Fountain, as well as customs and practices of both Dunn and Butler that allegedly resulted in a violation of Besselaar's constitutional rights. "Courts across this circuit dealing with similar allegations have reached the same conclusion: Longstanding and pervasive violence, extreme understaffing, extreme overcrowding, failures to monitor and control inmates, and uncontrolled weapons proliferation are allegations that plausibly create the inference that the prison's administrators were obviously, subjectively aware of the alleged excessive risk of inmate violence at the prison they oversaw." *Barefield,* 2023 WL 5417550, at *26 (citations omitted). Accordingly, the Court finds that Plaintiff has stated a claim for supervisory liability under § 1983 against Defendants Butler and Dunn.

### d. <u>First Amendment Claim</u>

In Count VIII of her amended complaint, Plaintiff alleges that Defendants Dailey and Nelson, in their individual capacities and acting under color of state law, violated Besselaar's First Amendment rights when they "employed the use of gang members at Fountain to attack, torture, terrorize, and ultimately murder Besselaar in direct response to Besselaar's exercise of his First Amendment right to complain of the conditions of his confinement." (Doc. 81 at 66- 67).

"Under the First Amendment, a prison official may not retaliate against an inmate for exercising his free speech rights, including the right to complain about the

conditions of confinement and to file prison grievances." *Moton v. Walker*, 545 F.

App'x 856, 860 (11th Cir. 2013) (citing *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir.

2003)). To prevail on a constitutional claim of retaliation against prison officials, an

"inmate must establish ... three elements: (1) his speech [or action] was constitutionally

protected; (2) the inmate suffered adverse action such that the [Defendants'] allegedly

retaliatory conduct would likely deter a person of ordinary firmness from engaging in

such speech [or action]; and (3) there is a causal relationship between the

retaliatory action and the protected speech [or act]." *Smith v. Mosley*, 532 F.3d 1270,

1276 (11th Cir. 2008) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th

Cir. 2005)).

Defendants argue that Plaintiff has failed to state a claim for a violation of

Besselaar's First Amendment rights because she has not alleged that either Dailey or

Nelson retaliated against Besselaar as a result of his exercise of, or to quell the

exercise of, his First Amendment rights. Plaintiff disputes this contention. As to Dailey,

she directs the Court to paragraphs 167 to 174 of her complaint in which she alleges

that Besselaar became the target of a series of attacks while housed in the RHU. She

specifically alleged:

> Upon being escorted back to the RHU, Officer L. Dailey, who
> worked as an RHU Officer regularly and treated [inmates]
> Chandler and Burton like family, asked Besselaar what he
> had told the state investigators. Besselaar did not respond to
> Dailey's inquiry. The same evening, the "Riot Team" came to
> the C-Side of the RHU and searched the cells. After they left,
> Burton told Chandler that Officer L. Dailey believed that
> Besselaar was the cause of the search. Chandler then told
> Besselaar that several officers, including Dailey and Foster,
> were Crips, and that he could have Besselaar's cell gate
> rolled open, and that he could send "hitters" to kill Besselaar.
> Chandler told Besselaar that unless he kept his mouth shut,

> Chandler would make the call. On July 6, 2021, Chandler
> and Burton executed a skit to get a Crip member out onto
> the "hallrunner" job. Officer Dailey let out Trent White (a
> Blood gang member) and Antoine "Itchy" Brown, [a Crip
> member], both as hallrunners.

(Doc. 81 at 35-36). As to Nelson, Plaintiff directs the Court to her allegations that

Besselaar witnessed a gang hit on another inmate who Nelson was escorting back to

his cell and had knowledge that Nelson attempted to cover it up at the direction of the

gang member who ordered it. (Doc. 81 at 40-42, 46). The Court agrees that these

allegations are not sufficient to state a claim for a constitutional violation of Besselaar's

First Amendment rights, and therefore, Count VIII against Dailey and Nelson is due to

be dismissed.

### 2. <u>Clearly Established</u>

Having determined that Plaintiff has stated a constitutional claim in Count IV

against Defendants Butler and Dailey under the state created danger doctrine and in VII

against Butler and Dunn for supervisory liability, the Court now must address whether

the rights in those two counts were clearly established. In *Lewis v. City of West Palm*

*Beach*, 561 F.3d1288, 1291-92 (11th Cir. 2009), the Eleventh Circuit stated:

> A right may be clearly established for qualified immunity purposes in one
> of three ways: (1) case law with indistinguishable facts clearly establishing
> the constitutional right; (2) a broad statement of principle within the
> Constitution, statute, or case law that clearly establishes a constitutional
> right; or (3) conduct so egregious that a constitutional right was clearly
> violated, even in the total absence of case law.

"For a constitutional right to be clearly established, its contours 'must be sufficiently

clear that a reasonable official would understand that what he is doing violates that

right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483

U.S. 635, 640 (1987)). "The salient question ... is whether the state of the law in [July of

2019] gave [Defendants] fair warning that their alleged treatment of [Besselaar] was unconstitutional." *Id.* at 741.

### a. State Created Danger Claim

The state created danger claims alleged against Defendants Butler and Dailey are both quite narrow. Specifically, Plaintiff alleged that "Butler created 'gang dormitories,' under which Besselaar was placed in actual, particularized danger of his life," and Dailey "released Trent White, a known Blood member, and Antoine 'Itchy' Brown, a known Crip member, as 'hallrunners' in the RHU, in order for Chandler to use these hall runners as 'hitters," assassins for the Crips, ... in violation of Fountain policies and knew of the particularized danger to Besselaar's life." Plaintiff has not cited any United States Supreme Court or Eleventh Circuit published opinions with indistinguishable or similar facts that support a finding that these alleged constitutional violations were clearly established in July of 2019, nor has the Court found any such case law. Nor has Plaintiff cited to a broad statement in the Constitution, a statute, or case law that clearly establishes a constitutional right under these facts. Thus, the question is whether the alleged conduct was "so egregious that a constitutional right was clearly violated."

In her complaint, Plaintiff acknowledges that Besselaar had learned that Warden Butler had segregated the dorms at Fountain by gang affiliation in an effort to reduce the incidents of violence. (*Id.* at 17). There is no evidence that Butler had "fair warning" that segregating dorms in this manner was unconstitutional, nor does the Court find that this conduct, in and of itself, was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, 561 F.3d at 1292; *see also Johnson v.*

*Dunn*, 2024 WL 1076802, at *28 (N.D. Ala. Mar. 12, 2024) (finding that inmate's state-created danger claim based on his allegation that the wardens knowingly created an environment that posed a substantial risk that he would be harmed by other prisoners was not clearly established); *Beaty v. Dunn*, Civ. A. No. 2L20CV279-ECM, 2022 WL 1721249, at *9 (M.D. Ala. May 27, 2022) (finding that inmate's state created danger claim, which overlapped factually with his failure to protect claim, did not violate clearly established law because it was a novel claim).

Plaintiff supports her state created danger claims against Dailey by alleging that he "released Trent White, a known Blood member, and Antoine 'Itchy' Brown, a known Crip member, as 'hallrunners' in the RHU, in order for Chandler to use these hall runners as 'hitters,' assassins for the Crips, ... in violation of Fountain policies and knew of the particularized danger to Besselaar's life." Contrary to the generalized claims against Butler, the claim against Dailey is specific and, if assumed to be true, as this Court must at this juncture, states a claim that is "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, 561 F.3d at 1292. Dailey, as a correctional officer, simply cannot argue that he did not have fair warning that allowing gang members to roam the RHU to act as assassins for a gang who had repeatedly targeted an inmate who had been placed in the RHU for his protection would violate the constitutional rights of that inmate.

On this basis, Defendant Butler is entitled to qualified immunity for the state created danger claim asserted against her and that claim is, thus, due to be dismissed. However, Defendant Dailey is not entitled to qualified immunity for the state created danger claim asserted against him.

### b. **Supervisory Liability**

At least as early as 1999, it was clearly established in the Eleventh Circuit by caselaw that "a warden, the person charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations," "could face liability under §1983 predicated on [the warden's] failure to take reasonable steps in the face of a history of widespread abuse or his adoption of custom or policies which result in deliberate indifference." *Valdes*, 450 F.3d at 1244. The Court finds that the *Valdes* case applies equally to the supervisory liability claim asserted against Defendant Dunn as it gives all persons charged with directing the governance and policies within correctional facilities fair warning that their failure to take reasonable steps in the face of a history of widespread abuse or their adoption of custom or policies which result in deliberate indifference could be unconstitutional. Accordingly, qualified immunity does not protect Defendants Butler or Dunn from Plaintiff's supervisory liability claim.

### F. **State Law Wrongful Death Claim**

In Count VI of Plaintiff's amended complaint, she sets forth a state law claim for the wrongful death of Besselaar. (Doc. 81 at 61-64). Defendants argue that they are entitled to State-agent immunity with respect to this claim and seek dismissal of Count VI on this ground. (Doc. 84 at 20-25).

"State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in exercising their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). In *Ex parte Cranman*, the Alabama Supreme Court summarized the general scope of State-agent immunity as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of

the claim against the agent is based upon the agent's
(1) formulating plans, policies, or designs; or
(2) exercising his or her judgment in the administration of a
department or agency of government, including, but not
limited to, examples such as:
(a) making administrative adjudications;
(b) allocating resources;
(c) negotiating contracts;
(d) hiring, firing, transferring, assigning, or supervising
personnel; or
(3) discharging duties imposed on a department or agency
by statute, rule, or regulation, insofar as the statute, rule, or
regulation prescribes the manner for performing the duties
and the State agent performs the duties in that manner; or
(4) exercising judgment in the enforcement of the criminal
laws of the State, including, but not limited to, law-
enforcement officers' arresting or attempting to arrest
persons; or
(5) exercising judgment in the discharge of duties imposed
by statute, rule, or regulation in releasing prisoners,
counseling or releasing persons of unsound mind, or
educating students.

Notwithstanding anything to the contrary in the foregoing
statement of the rule, a State agent *shall not* be immune
from civil liability in his or her personal capacity (1) when the
Constitution or laws of the United States ... require otherwise;
or (2) when the State agent acts willfully, maliciously,
fraudulently, in bad faith, beyond his or her authority, or
under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

"In order to claim State-agent immunity, a State agent bears the burden of
demonstrating that the plaintiff's claims arise from a function that would entitle the
State agent to immunity. If the State agent makes such a showing, the burden then
shifts to the plaintiff to show that the State agent acted willfully, maliciously,
fraudulently, in bad faith, or beyond his or her authority." *Ex parte Estate of Reynolds*,
946 So. 2d 450, 452 (Ala. 2006) (internal citations omitted). "A State agent acts beyond
authority and is therefore not immune when he or she 'fail[s] to discharge duties

pursuant to detailed rules or regulations....'" *Id.* (quoting *Giambrone v. Douglas,* 874 So. 2d 1406, 1052 (Ala. 2003)).

"[A] motion to dismiss is typically not the appropriate vehicle by which to assert ... State-agent immunity...." *Ex parte Ala. Dept. of Mental Health and Retardation*, 837 So. 2d 808, 813-14 (Ala. 2002). "[N]ormally the determination as to the existence of such a defense should be reserved until the summary-judgment stage, following appropriate discovery." *Id.* at 814. "[I]t is the rare case involving the defense of [State-agent] immunity that would be properly disposed of by a dismissal pursuant to Rule 12(b)(6)." *Ex parte Butts*, 775 So. 2d 173, 177 (Ala. 2000) (internal quotations and citations omitted). The reasoning behind this was aptly explained by the Alabama Supreme Court in *Odom v. Helms*:

> Procedurally, this rarity is unsurprising given the interactions between the factual "lens" applied at the motion-to-dismiss stage and the *Cranman/Reynolds* burden-shifting structure explained above. Under that structure, only after a State-agent defendant has shown agency and covered conduct is the plaintiff required to show a *Cranman* exception. Thus, in pleading a claim against a State agent, a plaintiff's initial burden is merely to state a cause of action against the defendant. The plaintiff need not anticipate a State-agent immunity defense by pleading with particularity a *Cranman* exception. Therefore, unless the inapplicability of all the *Cranman* exceptions is clear from the face of the complaint, a motion to dismiss based on State-agent immunity must be denied.

314 So. 3d 220, 229 n.3 (Ala. 2020).

This Court agrees that it is an exceptionally rare case where the defense of State-agent immunity would properly be disposed of by a dismissal under Rule 12(b)(6). Moreover, considering the totality of the allegations made by Plaintiff, the Court finds that Plaintiff has alleged facts that could plausibly defeat the State-agent immunity

defense. In addition, as conceded by Defendants, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala. Code § 6-5-410." *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011). "[S]tate-agent immunity do[es] not immunize [Defendants] from liability under state law if they violated [Besselaar's] constitutional rights." *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (*cited in Johnson v. Dunn*, 2024 WL 1076802, at *23 (N.D. Ala. Mar. 12, 2024)).

For these reasons, the Court finds that Defendant's motion to dismiss the wrongful death claim set forth in Count VI of the amended complaint on State-agent immunity grounds is due to be denied.

## <u>CONCLUSION</u>

Based on the foregoing, it is **RECOMMENDED** as follows:

1) that Defendants' motion to dismiss Plaintiffs' Second Amended Complaint as a shot gun pleading be **DENIED;**

2) that Defendants' motion to dismiss "newly raised claims" and "newly named Defendants" be **DENIED;**

3) that Defendants' motion to dismiss all claims for declaratory relief be **GRANTED** and that all claims seeking declaratory relief be **DISMISSED as moot;**

4)  that Defendants Butler and Dunn's motion to dismiss any claim asserted against them in their official capacity be **GRANTED** and any such claim be **DISMISSED;**

5) that Defendant Butler's motion to dismiss Count IV (State-Created Danger) on qualified immunity grounds be **GRANTED** and the claims asserted against Butler in

Count IV be **DISMISSED;**

 6) that Defendant Dailey's motion to dismiss the claims asserted against him in Count IV (State-Created Danger) on qualified immunity grounds be **DENIED;**

 7) that Defendants' motion to dismiss Count V (§ 1985(3) Conspiracy) be **GRANTED** for failure to state a claim and that Count V be **DISMISSED without prejudice;**

 8) that Defendants Butler and Dunn's motion to dismiss Count VII (Supervisory Liability) on qualified immunity grounds be **DENIED;**

 9) that Defendants Dailey and Nelson's motion to dismiss Count VIII (First Amendment) be **GRANTED** for failure to state a claim and that Count VIII be **DISMISSED without prejudice;** and

 10) that Defendants' motion to dismiss Count VI (State Law Wrongful Death) on State-agent immunity grounds be **DENIED**.

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

 A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. Gen. LR 72(c)(1) & (2). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was

informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** and **ORDERED** this the **24th** day of **May, 2024**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**